## LEYRA v. DENNO, WARDEN.

No. 635. Argued April 28, 1954.—Decided June 1, 1954.

*Osmond K. Fraenkel* argued the cause for petitioner. With him on the brief was *Frederick W. Scholem.*

*William I. Siegel* argued the cause for respondent. With him on the brief were *Nathaniel L. Goldstein,* Attorney General of New York, *Wendell P. Brown,* Solicitor General, *Samuel A. Hirshowitz,* Assistant Attorney General, and *Edward S. Silver.*

MR. JUSTICE BLACK delivered the opinion of the Court.

Camilo Leyra, age 75, and his wife, age 80, were found dead in their Brooklyn apartment. Several days later petitioner, their son, age 50, was indicted in a state court

charged with having murdered them with a hammer. He was convicted and sentenced to death, chiefly on several alleged confessions of guilt. The New York Court of Appeals reversed on the ground that one of the confessions, made to a state-employed psychiatrist, had been extorted from petitioner by coercion and promises of leniency in violation of the Due Process Clause of the Fourteenth Amendment.[1] 302 N. Y. 353, 98 N. E. 2d 553. Petitioner was then tried again. This time the invalidated confession was not used to convict him but several other confessions that followed it the same day were used. Petitioner objected to the admission of these other confessions on the ground that they were also coerced, but the trial court submitted to the jury the question of their "voluntariness." The jury convicted and the death sentence now before us was imposed.[2] The New York Court of Appeals, holding that there was evidence to support a finding that the confessions used were free from the coercive influences of the one previously given the psychiatrist, affirmed, Judge Fuld and the late Chief Judge Loughran dissenting. 304 N. Y. 468, 108 N. E. 2d 673. We denied certiorari. 345 U. S. 918. Petitioner then filed this habeas corpus proceeding in a United States District Court, charging that the confessions used against him had been coerced, depriving him of due process of law. The District Court properly gave consideration to the petition, *Brown* v. *Allen*, 344 U. S. 443, but denied it. 113 F. Supp. 556. The Court of Appeals for the Second Circuit affirmed, Judge Frank dissenting. 208 F. 2d 605. Petitioner then sought re-

---

[1] The confession was also held to have been in violation of state law and the state's due process clause.

[2] The death sentence was imposed under a conviction for first degree murder of the father. As to the death of his mother the jury found petitioner guilty of second degree murder which does not carry the death sentence. This second degree conviction is not before us.

view in this Court, again urging that he was denied due process on the ground that his confessions to a police captain and to two assistant state prosecutors were forced. We granted certiorari because the constitutional question appeared substantial. 347 U. S. 926.

The use in a state criminal trial of a defendant's confession obtained by coercion—whether physical or mental—is forbidden by the Fourteenth Amendment.[3] The question for our decision is therefore whether the present confessions were so coerced. This question can only be answered by reviewing the circumstances surrounding the confessions. We therefore examine the circumstances as shown by the undisputed facts of this case.

When the father failed to appear at his place of business on Tuesday, January 10, 1950, petitioner, his business partner, and others went to the father's apartment about 3 p. m. and found the bodies of the aged parents. Police were called. Although they first suspected a prowling intruder, the presence on the couple's disarranged breakfast table of a third teacup led them to think that the killer was a welcome guest. This and other circumstances drew suspicion toward petitioner. He and others were questioned by the police until about 11 p. m. on the evening of the day the bodies were discovered. On Wednesday, police again questioned petitioner from about 10 in the morning to midnight. Once more, be-

---

[3] See, e. g., Brown v. Mississippi, 297 U. S. 278; Chambers v. Florida, 309 U. S. 227; Lisenba v. California, 314 U. S. 219; Ashcraft v. Tennessee, 322 U. S. 143; Malinski v. New York, 324 U. S. 401; Haley v. Ohio, 332 U. S. 596; Watts v. Indiana, 338 U. S. 49; Stroble v. California, 343 U. S. 181; Stein v. New York, 346 U. S. 156. The above cases illustrate the settled view of this Court that coerced confessions cannot be admitted as evidence in criminal trials. Some members of the Court reach this conclusion because of their belief that the Fourteenth Amendment makes applicable to the states the Fifth Amendment's ban against compulsory self-incrimination.

ginning about 9 Thursday morning petitioner was sub-
jected to almost constant police questioning throughout
the day and much of the night until about 8:30 Friday
morning. At that time petitioner was taken by police
to his parents' funeral. While petitioner was at the
funeral and until he returned in the late afternoon, Cap-
tain Meenahan, his chief police questioner, went home to
get some "rest." After the funeral petitioner himself
was permitted to go to a hotel and sleep an hour and a
half. He was returned to the police station about 5 p. m.
on this Friday afternoon. During his absence a con-
cealed microphone had been installed with wire connec-
tions to another room in which the state prosecutor, the
police, and possibly some others were stationed to over-
hear what petitioner might say. Up to this time he had
not confessed to the crime.

The petitioner had been suffering from an acutely pain-
ful attack of sinus and Captain Meenahan had promised
to get a physician to help him. When petitioner returned
to the questioning room after the funeral, Captain
Meenahan introduced him to "Dr. Helfand," supposedly
to give petitioner medical relief. Dr. Helfand, however,
was not a general practitioner but a psychiatrist with con-
siderable knowledge of hypnosis. Petitioner was left with
Dr. Helfand while Captain Meenahan joined the state
District Attorney in the nearby listening room. Instead
of giving petitioner the medical advice and treatment he
expected, the psychiatrist by subtle and suggestive ques-
tions simply continued the police effort of the past days
and nights to induce petitioner to admit his guilt. For
an hour and a half or more the techniques of a highly
trained psychiatrist were used to break petitioner's
will in order to get him to say he had murdered his
parents. Time and time and time again the psychiatrist
told petitioner how much he wanted to and could help
him, how bad it would be for petitioner if he did not

confess, and how much better he would feel, and how much lighter and easier it would be on him if he would just unbosom himself to the doctor. Yet the doctor was at that very time the paid representative of the state whose prosecuting officials were listening in on every threat made and every promise of leniency given.

A tape recording of the psychiatric examination was made and a transcription of the tape was read into the record of this case. To show exactly what transpired we attach rather lengthy excerpts from that transcription as an appendix, *post,* p. 562. The petitioner's answers indicate a mind dazed and bewildered. Time after time the petitioner complained about how tired and how sleepy he was and how he could not think. On occasion after occasion the doctor told petitioner either to open his eyes or to shut his eyes. Apparently many of petitioner's answers were barely audible. On occasions the doctor informed petitioner that his lips were moving but no sound could be heard. Many times petitioner was asked to speak louder. As time went on, the record indicates that petitioner began to accept suggestions of the psychiatrist. For instance, Dr. Helfand suggested that petitioner had hit his parents with a hammer and after some minutes petitioner agreed that must have been the weapon.

Finally, after an hour and a half or longer, petitioner, encouraged by the doctor's assurances that he had done no moral wrong and would be let off easily, called for Captain Meenahan. The captain immediately appeared. It was then that the confession was given to him which was admitted against petitioner in this trial. Immediately following this confession to Captain Meenahan, petitioner's business partner was called from an adjoining room. The police had apparently brought the business partner there to have him talk to petitioner at an opportune moment. Petitioner repeated to his partner in a very brief way some of the things he had told the psychia-

trist and the captain. Following this, petitioner was questioned by the two assistant state prosecutors. What purports to be his formal confession was taken down by their stenographer, with a notation that it was given at 10 p. m., several hours after the psychiatrist took petitioner in charge.

On the first appeal the New York Court of Appeals held that the admissions petitioner made to the psychiatrist were so clearly the product of "mental coercion" that their use as evidence was inconsistent with due process of law. On the second appeal, however, that court held that the subsequent confessions here challenged were properly admitted. The Court of Appeals for the Second Circuit held the same thing. With this holding we cannot agree. Unlike the circumstances in *Lyons* v. *Oklahoma,* 322 U. S. 596, 602, 603, the undisputed facts in this case are irreconcilable with petitioner's mental freedom "to confess to or deny a suspected participation in a crime," and the relation of the confessions made to the psychiatrist, the police captain and the state prosecutors is "so close that one must say the facts of one control the character of the other . . . ." All were simply parts of one continuous process. All were extracted in the same place within a period of about five hours as the climax of days and nights of intermittent, intensive police questioning. First, an already physically and emotionally exhausted suspect's ability to resist interrogation was broken to almost trance-like submission by use of the arts of a highly skilled psychiatrist. Then the confession petitioner began making to the psychiatrist was filled in and perfected by additional statements given in rapid succession to a police officer, a trusted friend, and two state prosecutors. We hold that use of confessions extracted in such a manner from a lone defendant unprotected by counsel is not consistent with due process of law as required by our Constitution.

It was error for the court below to affirm the District Court's denial of petitioner's application for habeas corpus.

*Reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

[For dissenting opinion, see *post,* p. 584.]

## APPENDIX TO OPINION OF THE COURT.

*Excerpts from the transcript of the questioning of petitioner by Dr. Max Helfand, a psychiatrist, at the 88th precinct on January 13, 1950.*

"Q. What do they call you for short?   A. Buddy."

"Q. How old are you about?   A. Fifty."

"Q. Are you married?   A. Yes, sir."

"Q. Buddy, will you tell me something about yourself. I'll tell you what the purpose of my talk to you is.   I want to see if I can help you.   A. Yes, Doctor."

"Q. I know you are in a little trouble.   We do sometimes things that are not right, but in a fit of temper or anger we sometimes do things that we aren't really responsible for.   I want to see whether or not you did something but which you've done in a fit of temper or anger.   Do you understand me?   A. Yes."

"Q. Will you tell me something about yourself.   What kind of a boy are you?   Do you have a lot of friends? A. Yes, I have."

"Q. I can't hear you.   A. Yes, I have; and I am very tired.   I had two hours sleep.   Just now they woke me up.   That's since Tuesday.   Well, there were questions, after questions, after questions, by the thousands."

"Q. Aren't you rested now after two hours sleep.   You feel pretty good and you look good.   A. Well I went to

the barber and I feel clean and everything else. The only thing is I am very tired. I didn't feel as tired before I went to bed as I do now. You know—(interruption)

"Q. Do you know we sometimes feel tired if we have something on our mind. It's what we call mental tension."

"Q. Do you know we sometimes feel tired if we have something on our mind. It's what we call mental tension. If you talk to me and open up, you're going to feel relieved. Speak up and tell me. Do you have a lot of friends? A. Yes, I have a lot of friends."

"Q. Do you sometimes get into arguments with them? A. No, not as a rule. The first time I was surprised. I always considered myself an even tempered fellow—sociable. It's my sinus. It's bothering me something terrible. It got so in the last year or so. It got worse and worse and worse."

"Q. That made you nervous, didn't it? A. I didn't particularly notice it. For the past two years, my average of work has been about over a hundred hours each week of work for two years. No vacation or anything like that. The first time was anybody noticed it was about—let's see—it's about two weeks ago I went to the doctor with my father."

"Q. I see. A. My sinus was bothering me so bad I use to have to stop work during the day."

"Q. What was the matter with your father? A. Dad had a heart attack a couple of years ago, but I went for myself."

"Q. Your father was a nervous man too, wasn't he? A. Yes, but I went for myself. I didn't think I ever was high strung. I thought I was the opposite. I thought I was pretty calm."

"Q. Your father was high strung? A. Yes."

"Q. Fly off the handle quickly? A. Yes. So I went to the doctor and he examined my sinus. He took the

blood pressure. So he said to me, "When did you go to your doctor?" That was—today is Friday—one week back. The Tuesday of that week. It's ten or 11 days."

"Q. You went with your father? A. With my father."

"Q. Did he give you any treatments? A. Yeah, he examined my sinus."

"Q. Did he tell you to come back? A. No, he sent me down to have X-rays taken. When he examined me, he put the lights up here."

"Q. You didn't have any appointment with the doctor after your visit? Did he tell you to come back? A. Oh, yes. He sent me down to have a set of X-rays made. We had the X-rays made. Then I called the doctor and he said it was a very bad case of sinus. It wasn't something new. It was for many years back, and he said there was a lot of scar tissue there, and he asked me could I come right out. That was last Saturday. So Saturday night, I worked. That was my busiest night of the week. So I told him I wouldn't like to come on Saturday, so he said he doesn't have any patients on Sunday, could I come Monday. Monday, unfortunately, I had to work all alone, so I told him I'd make it Tuesday night. So he said, "You come over Tuesday. I'll be able to do something to stop those pains." So we made the appointment for Tuesday night at six o'clock."

"Q. For you? A. Yes, and he was going to open those—"

"Q. Not for your father? A. No, for myself. My father was with me. He was to go with me on this Tuesday also."

"Q. Why? Did your doctor tell you to bring your father? A. No, he didn't tell me to bring him."

"Q. Why was your father going with you? A. He wanted to go with me. He wanted to see if something couldn't be done to stop those pains. He said, "Lie down

and close my eyes and see if I could stop the beating up there."

"Q. When the pain got so bad, didn't you get nervous?" "A. Yes, I guess I did. That was the first time anyone ever told me that I was ill. When the doctor took my blood pressure, he said, "You're very irritable." And I said, "I didn't think so." He told me, he said, "You're going to have to—you can't work day and night. It's too much." He said, "You got to slow down."

"Q. I want you to recollect and tell me everything. I am—"

"Q. —(continued)—going to make you remember and recollect back and bring back thoughts—thoughts which you think you might have forgotten. I can make you recollect them. It's entirely to your benefit to recollect them because, you see, you're a nervous boy. You got irritable and you might have got in a fit of temper. Tell me, I am here to help you. A. I wish you could, Doctor."

"Q. I am going to put my hand on your forehead, and as I put my hand on your forehead, you are going to bring back all these thoughts that are coming to your mind. I am going to keep my hand on your forehead and I am going to ask you questions, and now you will be able to tell me. What happened Monday night? Where did you sleep? A. Last Monday night?"

"Q. That's right. A. I worked Monday night."

"Q. After you worked, where did you sleep? Where did you go to sleep? A. To the apartment on 10th Street."

"Q. What time did you sleep to, or get up in the morning? A. She got up about 6:30."

"Q. Well, after she left the house, then you couldn't sleep. Then you got dressed? Your thoughts are coming back to you. Answer me. Come on, you can answer

me. You couldn't go back to bed. You didn't go back to bed. After she left, you got dressed, didn't you? A. Yes, I got dressed."

"Q. What did you do after you got dressed? Come on, now. Your thoughts are coming back to you. Come on. Come on, answer me. A. I went to Brooklyn."

"Q. You went to Brooklyn. Where did you go to Brooklyn? A. To my mother's house."

"Q. To your mother's house. When you came to your mother—now, all your thoughts are beginning to clear up. Now, everything is clear in your mind. You came to your mother. Who opened the door? A. My mother."

"Q. What did you say? A. I said, "Hello, Teddy.""

.       .       .       .       .

"Q. All right. Now, you are in your house. Your thoughts are coming back to you right away. A. Doctor, can I have a drink of water, my mouth is very dry."

"Q. A drink of water? I'll get you a drink of water. A. (Pause)."

"Q. All right. O.K. now? A. My mouth is dry. I'm not thirsty. Just my mouth is dry. I'm not thirsty."

"Q. Concentrate and look at me. Now you came home. Your mother met you at the door. You said, 'Hello, Teddy,' right? A. That's right."

"Q. What did she say to you? A. She said take off my coat, it's all wet."

"Q. What did you do? A. I took the coat off."

"Q. Now, you are back in your apartment, see. Your thoughts are clear now. What did you do after you took off your raincoat? A. She told me, "Come and have some tea.""

"Q. She told you what? A. 'Come and have a cup of tea. It will warm you up.'"

"Q. What did you do? A. Dad was having breakfast."

"Q. Where was Dad sitting?  A. At the end of the table."

"Q. Where did you sit down?  A. Between them."

"Q. Between whom?  A. Mom and Pop."

"Q. Between Mom and Pop?  A. That's right."

"Q. Where was Mom sitting?  A. Next to the kitchen sink."

"Q. You were sitting between Mom and Pop, right? A. That's right."

"Q. What did you do then?  A. I sat down."

"Q. Yeah, what did you do?  What did you do when you sat down.  Come on, speak up.  Don't be afraid now.  We're with you?  We're going to help you.  You're going to feel lots better after you talk to me.  A. Gee, I hope so."

"Q. I can't hear you?  A. The argument started all over again."

"Q. The argument with your father?  A. Yes."

"Q. Did your mother argue with you, too?  A. No."

"Q. What was the argument about?  A. The business—his business."

"Q. Whose business?  A. Our business."

"Q. What did you father tell you—speak up.  A. He told me both of us didn't care whether his business was good or bad.  I told him our business was getting prosperous."

"Q. What did you say about that?  A. He told me it wasn't so."

"Q. Was it a violent argument?  Did your father lose his temper?  A. Yes, it got more heated."

"Q. As it got more heated, what happened then?  Don't be afraid, speak up.  Come on, we'll help you.  A. He argued more and more."

"Q. You argued more and more.  Then what?  A. I told him, 'Pop, why don't you stay home?  Be satisfied.

Our business is getting good. You don't have to work this way.' "

"Q. Yes. A. He says, 'I'm going to work. I'm going to have my own business.' He says, "I'd rather make a stinking dollar than make it from somebody else.' So my mother started to get into the argument."

"Q. What did she say? A. She told him, 'Why don't you stay home. Why don't you do what your son says.' "

"Q. Go ahead, speak up. A. I'm trying to think, Doctor."

"Q. It's coming all clear to you now. I've got my hand on you. I'll make you think back. All your thoughts are coming back to you. Did your father hit you? A. No."

"Q. What happened next? Speak up. It's coming clear now. You will feel lots better after you tell me. It's all in a fit of argument. Speak up. Speak up. It's coming clear to you. I have my hand on your head. What did you do? Come on. A. I told him that we weren't going to let him work anymore."

.          .          .          .          .

"Q. Then? A. That he would be so much better off letting us take care of it. Twenty-five per cent we would give him from our business would be better than his own."

"Q. That's right. Go ahead. Come on, you're going to feel lots better. We're with you one hundred per cent. Then what happened? A. He said he wouldn't take it."

"Q. That's right. A. That we were traitors to him. He said my partner was a louse; that he took his hundred dollars a week and he didn't do anything for it."

"Q. Yes. A. It was like robbing him of a hundred a week."

"Q. That's right, speak up. A. My mother interfered and said, 'Bill was a nice fellow and a hard working fel-

low.' He said, 'I'm the boss.' He told my mother, 'You shut up.' He told my mother, 'Go sit down.' He pushed her in the chair.''

"Q. He pushed her in the chair? A. Yes."

"Q. That's the time you lost your temper? A. No."

"Q. Go ahead, what happened? A. I told him 'Pop, think it over. We're silly to argue. It will do us no good.' He said, 'Finish your damn tea. I'm going out and get my paper.' ''

"Q. Yes. A. He says, 'We'll go to the bank,' and he says, 'I'll go to Broadway and pick up the box tops and you'll go back and you'll all get out of this place;' and he says, 'If your mother agrees with you, she can go with you.' ''

"Q. Yes. A. So he went out."

"Q. Did he put his coat on? A. Yes."

"Q. He went out? A. Yes."

"Q. So then what happened? A. Mom said, 'Don't get excited.' ''

"Q. You were very excited? A. Yes."

"Q. Go ahead. Come on. Tell me what happened then. Come on, now, speak up. You're going to feel lots better. We're with you a hundred per cent. Come on. Come on, we'll help you. A. I can't Doc."

"Q. Yes, you can. All these thoughts are coming back to you. I have my hand on your head. When your father went out, your mother talked to you. Then what happened? What did you do to your mother. Come on. Speak up. Come on. All these thoughts are coming to you now. A. I can't think."

"Q. Sure you can. Look at me. Open your eyes. Now you know what happened. Look at me. I know you know what happened. A. I can't think."

"Q. Sure you can. Come on now. Don't be afraid. Your conscience will be clear. God will be with you, and everybody will help you if you tell the truth. Every-

body will help you, but nobody likes a liar, not even God. Come on now. Tell the truth. A. I can't think."

"Q. Your father went for the paper; then you hit your mother, didn't you? With what did you hit—with a hammer? Your thoughts are coming back to you. What did you use to hit your mother with? A. I loved my mother."

"Q. I know you did. You lost your temper. Don't be afraid. A lot of people do things that they are not responsible for while in a fit of temper. You see? A. My mother was the only thing in the world."

"Q. That's right. What did you hit her with? Come on, now. Speak up. A. I was so mad."

"Q. You were very mad. A. I said he's not going to treat my mother this way. He killed my brother."

"Q. Yes. He killed— A. My brother would have lived many years. The way my father made him work—"

"Q. That's right. A. I said he's not going to kill my mother and he's not going to kill me. The only way we can stop him. He's got to be stopped. He can't be the boss."

"Q. Go ahead. He's got to be stopped, you said. So? A. My mother always said she wanted to be with him."

"Q. Yes. A. Doc, I can't take it."

"Q. Come on, yes, you can. Speak up. So you thought it would be the right thing to do what? Come on. You started—"

"Q. (continued) now. Speak up. Everybody will help you. You're a nice fellow. You're a man now. You don't want to be a coward. Everybody will help you. You were excited. You did it in a fit of anger. A. I was never a coward."

"Q. I can't hear you. A. I was never a coward."

"Q. Come on, speak up. Your mother said she wanted to be with your father. So what did you do? A. I can't remember."

"Q. Sure you can. Speak up now. A. I can't."

"Q. Look at me. Look at me. A. Yes, Doc."

"Q. Your thoughts are coming into you. Don't be afraid Buddy. We're all with you one hundred per cent. We'll help you. We'll help you every way possible. I'm your doctor. I'm going to help you. A. I hope you can."

"Q. I know I can. If you will be honest with me, I'll help you. Everybody thinks a lot of you. You're a nice man. A. Doctor, can I have some water, please."

"Q. Sure have some water. A. Yes, sir."

"Q. Come on, take some more water. A. I'm not thirsty. It's just my mouth is dry."

"Q. That's because you're nervous, you see. Your conscience is bothering you. After you tell me and tell me the truth, then you will feel relieved. We're all with you one hundred per cent. Then you will be fine. Now, let me put my hand on your forehead again. A. It hurts so."

.     .     .     .     .

"Q. Sure you can think. Only cowards can't think. You aren't a coward. You can speak up. You know—you know what you did. Come on now. Come on. I have my hand on your forehead and your thoughts are coming back to you. Come on now. Now, your thoughts are coming back to you? A. No, Doc, they don't.

"Q. They're coming back to you. Concentrate on what I say. They're coming right in again. Your mother said—you said he had to be stopped. What did you do? A. I don't know, Doc."

"Q. You know you hit your mother first. You hit your mother on the head. Speak up. What did you do? A. I don't know, Doctor."

"Q. Yes, you do. Speak up, now. Speak up. See, I can make you talk very truly. I can give you an injec-

tion now.   It's much better if you tell it to me this way.
Come on, now, speak up.   A. I can't think, Doctor."

"Q. Just relax and concentrate and listen to me.   Speak
up.   What did you say?   You had his what?   You had
his what?   What about your hand back?   A. It's all
confused."

"Q. Sure it's confused because you don't want to think.
You are fighting.   You have a conscience.   As soon as
you talk to me your conscience will be relieved.   See, you
show tension now.   You're pale; your mouth is dry.   You
have a conflict.   As soon as you talk to me everything
will be relieved.   You are going to feel lots better.   Come
on.   A. Doc, I'm trying to think."

"Q. I'm trying to help you if you tell me the truth.
I am on your side.   I am going to help you all I can.
Come on, now, Buddy.   Be a nice fellow.   Put your hand
here.   All right.   Tell me what happened.   Come on.
Tell me what happened.   Your father went away, and
you said he had to be stopped.   What did you take.
What did you take in your hand?   Speak up, Buddy.   I
can't hear you.   Don't be afraid now.   A. I'm not afraid,
Doc."

"Q. Don't be afraid.   We're all with you.   We want
to help you.   A. I'm not afraid."

"Q. I can't hear you.   Speak up.   A. I'm not afraid,
Doc.   I'm not afraid, Doc.   I want you to help me."

"Q. Did you finish your tea?   A. I finished the tea."

"Q. You finished the tea.   So what happened then?
What did you do to your mother?   Concentrate—just
close your eyes and concentrate.   A. I can't.

"Q. All right, Buddy, you can think now.   Your head
is all clear now.   Try and get it clear.   A. It's not clear."

"Q. Just relax now and everything will come back to
you.   You know what happened.   Everybody—I mean,
these people know what happened.   It's much better for
you to come clean and play ball.   Everybody thinks you

are trying to hide something." "A. I don't want to hide anything."

"Q. Then speak up and tell me. You told me so far—you know you did it—you were in there. Did your mother start a fight with you? A. No."

"Q. Did she continue the argument? A. No, my mother was in agreement with me."

"Q. But you had a little argument about going with your father, is that what you said? A. No."

"Q. What then? A. I said, "Mom, if he don't stop, I'll kill him."

"Q. I didn't hear that. What did you say? A. I told her, I said, "Mom, if he don't stop the arguments with me, I'll kill him."

"Q. What did she say? A. So she said, "Calm down. Here, take a drink of water." So I said, "Just wait until he comes back. We'll finish this once and for all."

"Q. So. A. So she said, "Here, take a drink of water."

"Q. Go ahead. I'm with you. Don't be afraid. So. Speak up. So, what did you do then. Now, you know what you did. You've got a story on your mind. Come on. You can speak now. Come on, Buddy, speak." "A. Doc, I'm trying so hard."

"Q. I know you're trying. I'm trying with you because you're a nice fellow. A. I just can't think."

"Q. All right, get to the part where you said, "I'll kill him." So then what happened. You waited until he came back. Come on. A. Doc, I can't."

"Q. Speak up, I can't hear you. All right, what did your mother say when you said, "When he comes back, I'll kill him." What did your mother say? Did you take a drink of water? I can't hear you. A. I don't remember."

"Q. I see. So what did you do then? A. I don't know."

"Q. Now, you think. All your thoughts will come back to you. Just think. Just relax. All your thoughts will come back to you. I have my hand on your head. Your thoughts are coming back to you. It's much better for you. You will get along much better and you will feel better. I can't hear you. What did you say? A. Will I ever feel better."

"Q. You will if you tell me the truth. You won't if you don't. You may as well tell us and we'll work with you. We'll play ball with you. We'll help you if we can. It will make you feel better. Come on, now, speak up. You told your mother, "Wait until he comes back. I'll kill him." "A. She said, 'Here take a drink of water.' Doc, I can't remember."

"Q. Sure you can. Open your eyes. Don't say you can't. Just look at me. A. I just don't remember."

"Q. Sure you can. A. No, I can't think, Doctor."

"Q. Buddy, it doesn't help you if you say you can't think when you know you did it, so you may as well tell us and get our help. If you don't tell us and get our help, I'll wash my hands of you. All right, close your eyes and think hard. Just close your eyes now and your thoughts will come back to you. All your thoughts are coming back to you. You're a nice fellow and you're excited; and in a fit of temper you said you were going to kill him when he comes back. What did your mother do? Did she try to hold you? A. No."

"Q. I can't hear you. Did she hold you? A. No."

"Q. What did she do? A. She wanted to give me a drink of water. She took the cup and started to run the water."

"Q. She started what? A. She started to run the water."

"Q. Yes. She was facing the sink? A. She was facing the sink.

"Q. I can't hear you?   A. She was facing the sink."

"Q. So what did you do.  Speak up.  I'll positively help you if I can.  I'm with you one hundred per cent. I'm going to help you.  You're going to feel fine.  Your conscience will be clear and everything will be fine.  Don't hide anything.  You did it in a fit of temper.  Your mother went to the sink to give you some water.  So you did what?  You went up to her?  A. I was standing there waiting for him to come back.  I picked up the hammer."

"Q. You picked up the hammer?   A. Yeah."

"Q. I didn't hear that.  What did you say?  A. I picked up the hammer."

"Q. Yes . . . say it.  Say it.  A. I said, 'He killed my brother, he'll kill my mother, and he'll kill me'."

"Q. Yes.  You picked up the hammer.  Where was the hammer?   A. It was on the dish closet."

"Q. On the dish closet?   A. Yeah."

"Q. In what room?   A. In the kitchen."

"Q. What kind of hammer was it?   A. A big hammer."

"Q. Was it a carpenter's hammer?   A. It was a big hammer."

"Q. A big hammer.  You picked it up and then what? Don't be afraid.  Say it.  A. I can't, Doc."

"Q. I know you can't.  I know it's hard, but say it. We're working with you.  You're pale and dry.  You're nervous.  Just let me put my hand on your head and your thoughts will come in.  You picked up the hammer and your mother was standing near the sink—facing the sink—letting the water run; and you picked up the hammer and you said—you said, your father, he killed my son.  You said he is going to kill us all.  You remember that, don't you?  Come on, say it.  Speak up, come on. You move your lips.  You know you want to say it.  Say it a little louder.  Come on, Buddy.  We'll help you. Don't be afraid now.  A. I can't help you."

"Q I'll help you, Buddy. I am with you one hundred per cent, but you got to play ball with me. You know she was standing by the sink. You got to tell me the truth. A. No, she wasn't standing."

"Q. What was she doing? A. She was sitting."

.          .          .          .          .

"Q. Your mother was sitting at the end of the table; Joe you will have to speak loudly, I can't hear you? A. I got up from the table."

"Q. And you took a drink of water and you held the hammer in your hand. What did you do then? A. I can't think any more what I did."

"Q. It will come back to you? A. Doc. can I see the results?"

"Q. I can't tell you how you think you killed her? A. I must have; who else could have."

"Q. I want you to recollect your thoughts; tell me all the details. I can make you talk? A. I tried for two days; this thing came last night. Everybody was asking me questions. It didn't do any good to ask me; I couldn't answer them."

"Q. That's right? A. Everybody was nice to me."

"Q. Everybody was nice to you? A. Yes."

"Q. Nobody hurt you, did they? A. No."

"Q. Nobody forced you to answer anything? A. No, I just can't remember."

.          .          .          .          .

"Q. Come I am holding my hand on your forehead; I am making your thoughts clear. You know exactly what happened? A. Doc. I can't think. I must have done it but how.

"Q. What did you say? A. I said I must have done it but how.

"Q. You just told me, you had your hand on your head? A. I don't remember. From then on, I can't think of anything.

"Q. Alright relax and think. You stay here until your thoughts come back to you. Did you start any argument with your Mother? When your Father went down for the paper, did you start an argument with your Mother, after she gave you the water? A. No, I always babied my mother. (Noise)

"Q. Did you have it in mind that your Mother would die with your Father because you always wanted it? A. She always said that.

"Q. She always said what? A. That she wanted to die with him.

"Q. You had it on your mind, didn't you? A. I don't know Doc.

"Q. Think and tell me; just think and tell me. A. She was just like a baby to me.

"Q. Just relax and your thoughts will come back to you because I have my hand on your forehead. Everything will be fine. If you tell us all the details we will know the whole story of what happened. You picked up the hammer and your Mother was sitting on the chair, you said, and you were standing at the sink? A. I was standing by the stove.

"Q. You were standing by the stove, excuse me I made a mistake. What did you do with the hammer, you swung it? A. I must have Doc. Nobody else could have done it.

"Q. Nobody else could have you say you must have swung it? A. I must have.

"Q. And your Mother fell down. How many times did you swing it. You must tell me that. How many times did you swing the hammer? A. I don't know Doctor.

"Q. Was it once or twice or three times? A. I don't know.

"Q. How many times? A. I was never angry with my Mother.

"Q. Were you angry with you Father? A. I was very angry with him.

"Q. And you felt that your Mother should die at the same time with your Father? A. I don't know.

"Q. What did you do then, when your Father came in. You heard him come up. What floor do you live on? A. Street floor; I was in the back.

"Q. And your Father opened the door to the apartment, when he came back with the paper? A. I don't know, Doctor.

"Q. Think, think. A. I don't know why, I can't think.

"Q. I am helping you to think, if you want to you can. There is only a question of wanting. A. I want to so bad.

"Q. If you want to you can because you know everything that happened. We know that you are a nice man and I am trying to help you. When your Father came back with the paper; now here you are, you are in the apartment and your Father came back with the paper? A. I can't remember, Doctor.

"Q. Sure you can. A. I don't remember, Doctor.

"Q. Sure you can; try hard. A. I thought sometimes last night. I told the Captain last night I can't remember. That I would have to remember.

"Q. Why do you have to remember? A. Because if I can't remember these things here, my own children may not be safe. I can't remember what happened; I don't know what happened. I can't think.

"Q. What do you think will happen to the children? A. I don't know; it worries me.

"Q. What do you think might happen to the children? A. I was there with a hammer in my hand I know it. I remember having a hammer in my hand.

"Q. Take your time and relax. Now open your eyes and look at me, just open your eyes—look at me your

thoughts will come back, look at me and concentrate. You said you were at the stove with the hammer in your right hand. You were very, very angry you said, right? A. I was never angry at my mother but my Father accused me.

"Q. Accuses you of what? A. That I was trying to put him out of business. The first day we went into the new business we gave him an equal share with us. (Noise) I knew for years that he killed my brother. My brother did the work of six men; he gave him a measly ten dollars a week. He'd sooner lose his son and stay in business so he could save the money and live with my mother.

"Q. Everybody is with you one hundred per cent. You were angry with your Father; you were never so angry like that in all your life? A. I can see what happened Doc but I can't remember.

"Q. Just concentrate and your memory will come back to you. You want to say something because I can see your lips moving. You are a nice fellow. Everybody likes you, everybody can make a mistake. Now speak up and tell us what happened. Alright, speak up; you know some things. What happened next? Your Father came back with the paper, what did you do? A. I can't think Doc. It doesn't come to me. (Noise)

"Q. I've got my hand on your forehead, your thoughts will come back to you, everything will be clear? A. Hold my temples Doc.

"Q. You say you want me to hold your temples. Now your thoughts are coming back, that's right. The pain was only a tension; it's nervousness. I'm trying to make you speak. I want you to speak up and I want you to tell me everything, now speak up. A. Do I have to?

"Q. Sure you have to; it will be much better for you, now speak up. A. I don't remember much. I promised the Captain I would speak up.

"Q. Was the Captain good to you? A. He was wonderful.

"Q. Was I good to you? A. Everybody was good to me.

"Q. We are all trying to help you, we are all trying to help you. Your thoughts are coming into you. Now what happened next. You think and you tell me; where were you standing?

.           .           .           .           .

"Q. Just close your eyes and it will all come back to you. Just close your eyes and relax. A. I'm trying to Doc. I came back from the cemetery today. All the way down from the cemetery I tried to force myself to remember. I can't. (Noise) I'm trying to remember, how could I do this to my mother. I'm trying to remember.

"Q. I can understand that you loved your mother? A. My mother yes. I can't think. It's awful.

"Q. I can understand how you feel about your mother. A. They told me to rest. I took a good shower and I slept. I was very tired; I was tired, when I got up.

"Q. I can understand how you feel about your Mother. (Noise) You were never so angry in all your life as you were at that time. You told your Mother that you were waiting to kill him. You were waiting for him to come back with the paper. That is what you told me. I can understand that the anger was sufficient to kill your Father? A. Why my mother?

"Q. I don't know about your Mother but as far as your Father was concerned your thoughts were pretty clear, right? A. When he came back I said I was going to settle it once and for all.

"Q. When he came back you said to him you were going to settle this thing once and for all? A. I said I was going to settle this thing once and for all. I stood there standing with the Hammer waiting for him to come back.

"Q. Just take your time now. You were standing there with the hammer. Now your Father came back again? A. I don't remember.

"Q. Close your eyes and your thoughts will come back, relax. I am going to make your mind recollect everything. Your mind is getting clearer and clearer; all your thoughts are coming back now. Now they're coming back. Now your Father went for the paper; your Father came back. Now talk to me. Now your mind is clear. (Noise) Speak up and tell me. A. I can't remember him coming back.

"Q. Yes you can concentrate, just concentrate and you can see your Father come back now. How long did it take for him to get the paper? A. Oh, just a few minutes.

.      .      .      .      .

"Q. And in a few minutes, you heard him come in? A. I don't remember him coming in.

"Q. What did you do to your mother in the meantime? A. I don't know. If I could only think.

"Q. What do you think? Come, think, think. I want to tell you something. You are a smart fellow. I may as well be very frank with you. Everything does not alter the case for you. They are not going to work with you and I am not going to work with you if you don't help yourself. A. I want to help myself.

"Q. Now, you see all the details are there. You say yourself, you were the only one there. You say you must have done it? A. We talked this over for twelve hours.

"Q. But you didn't remember all the facts that you told me. Now your mind is clear. A. I can't remember how that happened.

"Q. The fact that you remember or don't remember don't help you, you know. If you remember and come across like a good man—A. Doc, I want to help myself. I can't remember.

"Q. If you tell us the details and come across like a good man, then we can help you. We know that morally you were just in anger. Morally, you are not to be condemned. Right? A. Right.

"Q. But you have to tell us the details, then we will know that you are above board and on the level. Otherwise, we just don't do nothing to you and you will get the worst of it. A. I can't remember. I must have done it. I don't deny that I did it.

"Q. You don't deny what? A. I don't deny that I did it. I must have done it.

"Q. You don't deny that you didn't do it, you mean? A. No, I don't say I didn't do it. I know I did it.

"Q. You know you did it? A. Here is the proof of it.

"Q. Do you know you did it? A. I can't remember doing it. I know it happened. Look at my mother, the woman that I love most in the world. Look. How did it happen? I can't even remember. I can't remember him. I can't remember him coming back. Doctor, can anybody be this crazy?

"Q. That is not crazy, my friend. That is not crazy. When you don't remember anything, that is not crazy. If I forget that I owe somebody ten dollars, that doesn't mean that I am crazy. If you forget the incidents of this thing, that does not mean you are crazy. A. I didn't say it that way.

"Q. You said, 'Can anybody be that crazy?' You are not crazy. A. I want to remember this thing. I have got to remember it.

"Q. This is what we call amnesia and in other words, a wish to forget because it is not pleasant. It does not mean that you are crazy. A. I didn't say that doctor. You misunderstood me.

"Q. I must have misunderstood you. A. I didn't say I was crazy.

"Q. You don't think you are crazy, do you? A. No, I hope not.

"Q. Do you think you might be crazy? A. No, I don't think so.

"Q. Of course not. You are not crazy. You are a nice fellow. I am willing to stay here with you and help you but you have got to help yourself. A. I have tried today for hours to recall from here on, from the time that my mother—I can recall everything. I did it last night. Here, it took hours to piece together things. I sat here. I was so confused that I didn't know whether I owned this suit. I didn't know whether I had a pair of shoes.

"Q. Everything is clear up to the point where you held the hammer in your hand? A. That's right but why can't I remember from there on?

"Q. If you will just stop for a minute, you will remember. And your thoughts will come into you. A. Doctor, I am exhausted, so please be patient.

"Q. I am patient. A. I appreciate that.

"Q. I will stay here with you all night, if you want to? A. The Captain and I last night, he was so patient. He waited for hours until these things came home.

"Q. For hours? A. I appreciate it.

"Q. Do you want me to wait? A. I told him that the last time. It's got to come back. I have been trying to remember all day.

"Q. Take your time. Just take your time. A. I am trying to remember.

"Q. You got a much better chance to play ball, (Then noise) than if you say you don't remember.

"Q. If you tell me that you were in a fit of anger, that you were angry, that you just swung the hammer, but if you tell me that you don't remember, then you will be working against yourself. Where will it get you? A. At that point there, I was so mad. I was like white hot

metal. I was so mad. I was never mad at anyone in my life. (Then noise)

"Q. Do you feel better? (Then noise) Do you want coffee? A. I drank coffee all night long. (Then noise)

"Q. These people are going to throw the book at you unless you can show that in a fit of temper, you got so angry that you did it. Otherwise they toss premeditation in and it's premeditation. See?

"Q. Drink your coffee. Take your time. I got time. You got time. Just relax. Want some more coffee? A. I would like some hot coffee, doc. I would like to speak to the Captain.

"Q. To whom? A. To Captain Meenahan.

"Q. You would like to speak to him? You want me to call him? A. I wish you would.

"Q. Do you want me to come back? A. I don't know. He was awful good hunk last night.

"Q. Well, we were getting along very nicely. I am trying to straighten him out with his troubles. He seemed a little mixed-up. His mind is clear now. I made him concentrate. His mind is much clearer. You can take my seat, Captain. "Q. Can I speak to the Captain?"

MR. JUSTICE MINTON, with whom MR. JUSTICE REED and MR. JUSTICE BURTON join, dissenting.

This petitioner was charged with murdering his parents by beating the life out of them with a hammer. No one claims that he has a defense to the charge. It is contended, however, that his conviction was not obtained in accordance with due process of law.

He has already had two trials. His first conviction was appealed and reversed. The second one was appealed and affirmed, and this Court denied certiorari on a petition that set up the same constitutional questions now raised. Then habeas corpus proceedings were instituted

in the United States District Court for the Southern District of New York and relief was denied. That judgment was affirmed by the United States Court of Appeals for the Second Circuit and is the one now here on certiorari.

The New York Court of Appeals reversed the first conviction on the ground that a confession introduced in evidence at the trial was the result of mental coercion and hence involuntary. The threats, cajoling, and promises of leniency, utilized by Dr. Helfand, a psychiatrist called in by the District Attorney, to induce petitioner to confess were soundly condemned by that court. The confession thus obtained was held inadmissible for the purpose of proving petitioner's guilt. But petitioner's subsequent confessions to Captain Meenahan of the police, to the two assistant district attorneys, and to his business associate, Herrschaft, were not invalidated as a matter of law. The case was remanded to the trial court with directions to submit to a jury under proper instructions the question whether the subsequent confessions resulted from or were influenced by the mental coercion which produced the Helfand confession.

The case was tried a second time, and the question of the voluntariness of the subsequent confessions was submitted to the jury under clear and ample instructions as to which petitioner raises no objection here. The jury returned a verdict of guilty of first-degree murder of the father, and a sentence of death was imposed.

We are now asked to hold that the later confessions were involuntary as a matter of law and that petitioner was denied due process of law under the Fourteenth Amendment because the jury was allowed to consider the voluntariness of the subsequent confessions. It seems to me the very essence of due process to submit to a jury the question of whether these later confessions were tainted by the prior coercion and promises which led to the Helfand confession. I am familiar with no case in

which this Court has ever held that an invalid confession *ipso facto* invalidates all subsequent confessions as a matter of law. It does not seem to me a denial of due process for the State to allow the jury to say, under all the facts and circumstances in evidence and under proper instructions by the court, whether the subsequent confessions were tainted or were free and voluntary. This is precisely what New York did. In *Lyons* v. *Oklahoma,* 322 U. S. 596, 603, it was said:

> "The Fourteenth Amendment does not protect one who has admitted his guilt because of forbidden inducements against the use at trial of his subsequent confessions under all possible circumstances. The admissibility of the later confession depends upon the same test—is it voluntary."

The only question before us is whether the effects of the coercion practiced by Dr. Helfand so clearly continued to influence petitioner's mind as to make unreasonable any conclusion other than that the later confessions were also coerced. If there was evidence to support contrary inferences as to the continuing effect of the coercive practices, the conviction should not be disturbed. It is not our function to set aside state court convictions on the ground that the verdict is against the weight of the evidence. *Stein* v. *New York,* 346 U. S. 156, 180.

The evidence shows an involuntary confession to Dr. Helfand.* It was followed a few minutes later by a

---

*The record discloses that petitioner was questioned by Captain Meenahan on Tuesday, the day of the murder, from about 9 or 10 in the evening until 10:30 or 10:45 at his parents' apartment. On Wednesday at about 10 in the morning, he was met at his place of business by detectives who questioned him off and on until 1:20 p. m., when Captain Meenahan began an interrogation which was concluded at 11:30 or 12 that night. He was then allowed to go home. It was not until Thursday that he was taken in custody. That

confession to Captain Meenahan. Some half hour later petitioner confessed to a business associate, Herrschaft, saying, "Well, you know what it's all about; I did it." Herrschaft asked, "Do you mean that you killed your own mother and father?" and petitioner replied, "I did it." This confession was admitted in this Court to have been voluntarily made, and no complaint is made of its admission in evidence. Sandwiched in between the Meenahan confession and the confession to the assistant district attorneys some two and one-half hours later, the Herrschaft confession presents enough evidence in itself to go to the jury on whether these three confessions, one admitted to have been valid, were all given by petitioner voluntarily with the considered purpose of making a clean breast of the whole thing.

Nor was this the only evidence. Petitioner boldly examined Dr. Helfand, the State's witness, for the purpose, among others, of laying a foundation for the introduction of expert testimony by petitioner's psychiatrist that the effect of the coercion carried over to the later confessions. Petitioner's expert testified as expected. The State then placed on the stand another psychiatrist who gave the opposite opinion, based on evidence that petitioner in his later confessions gave details of the crime known only to him and gave them freely without urging. If this disagreement between experts did not under New York law

---

morning he was taken out by detectives to check his alibi. Questioning by Captain Meenahan began again about 2 that afternoon. He was kept at the station until 8:30 o'clock Friday morning, but there was little questioning after 10 p. m. Thursday evening. On Friday morning, he was taken to his parents' funeral and then permitted to sleep for an hour and a half. He was returned to the police station, and about 5 o'clock Friday afternoon the interview with Dr. Helfand began. The coercion practiced by Dr. Helfand was forcefully condemned by the New York Court of Appeals and caused it to declare the confession to Dr. Helfand invalid as a matter of law. The validity of this confession is not involved.

constitute a conflict in the evidence sufficient standing alone to go to the jury, there was other evidence, such as the Herrschaft confession, to be considered, together with the testimony of the assistant district attorneys that petitioner seemed quite normal and relaxed, and relieved to talk to them. As I said before, it is not our function to weigh the evidence. Whether there was any evidence to go to a jury is the question. In my opinion, there was a question of fact presented by the evidence.

This Court concluded its opinion in the *Lyons* case in these words:

> "We cannot say that an inference of guilt based in part upon Lyons' [later] McAlester confession is so illogical and unreasonable as to deny the petitioner a fair trial." *Lyons* v. *Oklahoma, supra,* at 605.

I cannot say here that the subsequent confessions as a matter of law were so completely under the influence of the first confession that to let a jury pass upon that influence as it affected the voluntariness of the later confessions amounts to a denial of due process of law. To let the jury pass upon this question is not so unfair to petitioner as to violate the fundamental principles of justice.

It is contended that the promises of leniency made by Dr. Helfand stand on a different footing; that once a promise is made, its effect must be presumed to continue until the promise is clearly withdrawn. But such has never been the law. See *State* v. *Willis,* 71 Conn. 293, 313, 41 A. 820, 826. As in the case of other forms of coercion and inducement, once a promise of leniency is made a presumption arises that it continues to operate on the mind of the accused. But a showing of a variety of circumstances can overcome that presumption. The length of time elapsing between the promise and the confession, the apparent authority of the person making the promise, whether the confession is made to the same per-

son who offered leniency, and the explicitness and persuasiveness of the inducement are among the many factors to be weighed.

There are two parties to this case, the State and the petitioner, and on the State rests the heavy burden of proving guilt. As Mr. Justice Cardozo said in *Snyder* v. *Massachusetts,* 291 U. S. 97, 122:

> "But justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true."

New York must be mystified in its efforts to enforce its law against homicide to have us say it may not submit a disputed question of fact to a jury. The Court holds that to do so denies due process. The answer to that question, which did not seem substantial to us when certiorari was sought to review the decision of the New York Court of Appeals, now emerges crystal clear when we are reviewing the decision of a *federal* court dealing with it in a collateral habeas corpus proceeding. And yet the jury and a majority of the judges of every court, state and federal, that until now have considered the matter have found no such failure to observe constitutional standards. Mr. Justice Cardozo's words in the *Snyder* case, *supra,* at page 122, seem especially pertinent here:

> "There is danger that the criminal law will be brought into contempt—that discredit will even touch the great immunities assured by the Fourteenth Amendment—if gossamer possibilities of prejudice to a defendant are to nullify a sentence pronounced by a court of competent jurisdiction in obedience to local law, and set the guilty free."

The careful, considerate, fair trial accorded petitioner is in keeping with the fundamental essentials of justice which are due process, and I would affirm.