387 So.2d 1016 (1980)
Danny Ray GASPARD, Appellant,
v.
STATE of Florida, Appellee.
No. OO-381.
District Court of Appeal of Florida, First District.
September 10, 1980.
*1018 Michael J. Minerva, Public Defender, and Louis G. Carres, and Margaret Good, Asst. Public Defenders, for appellant.
Jim Smith, Atty. Gen., and Raymond L. Marky, Asst. Atty. Gen., for appellee.
LARRY G. SMITH, Judge.
Gaspard's appeal from his conviction of the crime of false imprisonment presents the issue of whether his written confession given on Thursday, April 13, 1978, four days after his arrest, was shown by the State to have been free of the coercive influences found sufficient by the trial judge to suppress his oral confession made on Wednesday evening, April 12, 1978. Appellant contends that nothing in the evidence shows a break in the chain of circumstances sufficient to erase the taint of the coercive interrogation that made his Wednesday evening confession inadmissible. We agree and reverse.
Appellant was charged with kidnapping arising from an incident in which he allegedly drove his automobile from Quincy, Florida, into the State of Georgia, carrying with him against her will a minor female whom he forced to engage in oral sex with him, then released. An alert police officer who knew a warrant had been issued for appellant's arrest, using identification furnished by individuals who had been in the company of appellant and the victim just prior to her abduction spotted appellant on his return through Quincy and placed him under arrest. It was not known until a week later that the victim, unharmed, had made her way back to Ft. Lauderdale. During the four days following his arrest appellant was subjected to multiple interrogations, including two polygraph tests, which produced incriminating statements and a written confession, all of which appellant moved to suppress prior to trial.
The facts as established at the suppression hearing show that appellant was arrested at 1:05 a.m. on Sunday, April 9, 1978. At the police station he was given a Miranda warning and interrogated by officers until approximately 3:00 a.m., and by the State Attorney's investigator until approximately 4:00 a.m. At about 6:30 a.m. on the same date appellant accompanied officers to the spot in Georgia where he said he last saw the victim, and was then returned to Quincy at about 11:00 a.m., and placed in the county jail.
Further interrogation took place on Monday, April 10, at the State Attorney's office in Gadsden County. Additional trips were made to Georgia, but the record is not entirely clear when these trips were made.
On Tuesday, April 11, 1978, appellant was again taken to the State Attorney's office for a polygraph examination administered by an examiner employed with the Florida Department of Criminal Law Enforcement. Testimony of the participating officers differ as to the exact time of this examination and how long it lasted. It apparently began no earlier than about 4:00 p.m., and continued not later than 10:00 p.m. that evening. During this polygraph test the examiner, or one of the investigating officers, told appellant that his minor victim had been found dead and that her body was in a morgue, which was untrue. During the examination appellant stated that the victim was alive when he last saw her. The examiner testified that the polygraph indicated this response was untruthful, and appellant was so advised, although it was in fact true.
A second polygraph examination was conducted on Wednesday, April 12. This interrogation extended from about 12:30 or 1:00 p.m. until 5:30 or 6:00 p.m. Only the examiner and appellant were present in the room while the examination was being conducted; however, several officers, including Assistant State Attorney Richmond, Sheriff Woodham and Captain Clark of the Sheriff's *1019 Department were all present in an outer office.
During this second polygraph examination screams were heard coming from the polygraph room. When the Assistant State Attorney entered the room, appellant crawled on his hands and knees across the room, crying, and grabbed the Assistant State Attorney around the waist, saying, "I didn't mean to kill her. I didn't kill her." One officer testified that appellant was "just crying and carrying on, just hollering and screaming."
The polygraph examiner testified that during the second polygraph examination, on Wednesday afternoon, appellant's appearance was that "of a dog that had been whipped," that he became "quite upset," and was psychologically and mentally exhausted.
Continuing into Wednesday evening, after the polygraph examination, appellant was interrogated by two investigators from the State Attorney's office. This interrogation lasted from approximately 6:00 p.m. until about 7:00 p.m., when the officers obtained from appellant an oral statement. During either this Wednesday evening interrogation, or that of the day before, appellant asked for psychiatric help.
Appellant testified, without contradiction, that the Assistant State Attorney read to him from the Florida Statutes concerning the death penalty, and that he was told "about the electric chair" many times during the interrogations. At one point during the interrogations the officers succeeded in obtaining a "false confession" in which appellant stated that he "had visions and remembered something vaguely about some water and putting some brush or brushes over her." Evidence at the trial revealed that nothing of this sort occurred.
On Thursday, April 13, 1978, appellant was taken to the office of the Sheriff in the Gadsden County Courthouse, where Sheriff Woodham and Captain Clark continued the interrogation. After again being advised of his rights, the Sheriff testified that appellant gave oral statements, then a written statement. This interrogation commenced at about 8:30 a.m. and terminated with the obtaining of the written statement at approximately 10:30 a.m.
At the suppression hearing the State indicated that it would seek introduction into evidence only of the Wednesday night oral confession and the Thursday morning written confession. The trial judge suppressed the Wednesday evening oral confession, but ruled that the Thursday morning written confession would be admissible, based upon his determination that sufficient time had elapsed from the interrogation of the previous evening, and under all the circumstances, that this could be considered to have been freely and voluntarily made.
We conclude that the ruling as to the Thursday morning confession was erroneous based upon the recent decision of the Florida Supreme Court in Brewer v. State, 386 So.2d 232, (Fla. 1980), because here, as in Brewer, the State has failed to carry the burden of showing that the coercive influences which produced the inadmissible Wednesday night confession had been dissipated prior to the Thursday morning confession.
Once it is established that there were coercive influences attendant upon an initial confession, the coercion is presumed to continue "unless clearly shown to have been removed prior to a subsequent confession." State v. Outten, 206 So.2d 392, 396 (Fla. 1968). The inquiry is whether, under the circumstances, the influence of the coercion that produced the first confession was dissipated so that the second confession was the voluntary act of a free will. See, e.g., Darwin v. Connecticut, 391 U.S. 346 [88 S.Ct. 1488, 20 L.Ed.2d 630] (1968); Leyra v. Denno, 347 U.S. 556 [74 S.Ct. 716, 98 L.Ed. 948] (1953); United States v. Bayer, 331 U.S. 532 [67 S.Ct. 1394, 91 L.Ed. 1654] (1947); Lyons v. Oklahoma, 322 U.S. 596 [64 S.Ct. 1208, 88 L.Ed. 1481] (1943). (Brewer v. State, supra, at 236).
Upon examining the "totality of the circumstances surrounding the confession," as mandated by Brewer, we find nothing upon *1020 which to predicate a ruling that the mere lapse of time between termination of the Wednesday evening confession at 7:00 p.m. and commencement of the Thursday morning interrogation at 8:30 a.m., is sufficient to clearly show removal of the coercive influences previously exerted upon appellant.
Because we are dealing with the cold record, we must first recognize the rule that a determination by the trial judge that a confession was freely and voluntarily made comes to a reviewing court with the same presumption of correctness which attends jury verdicts and final judgments. Stone v. State, 378 So.2d 765 (Fla. 1979). Our review in light of this rule has a dual aspect, for on the one hand the trial judge's ruling invalidated, as involuntary, the purported confession made on Wednesday evening, April 12, but held voluntary, and admissible, the Thursday morning statement. As to the suppression of the Wednesday evening statement we are satisfied that the ruling of the trial judge, after hearing the testimony of the law enforcement officers who participated in the interrogation, and that of the appellant, was eminently correct. We agree with the judge's observations found in the record of the suppression hearing concerning the tactics used during the interrogation, and we further agree with his ruling excluding the Wednesday evening statement, as follows:
THE COURT: Well, the investigation that was going on initially was to either locate a missing girl, a missing thirteen-year-old girl, with some indications that foul play had occurred. And I think there is a great deal of latitude to officers who are trying to not just solve a crime that has been committed, but to ascertain the destiny of someone who is a possible victim. So the interrogation was critical to get information and get it as quickly as possible and to rescue the girl, or least find her if she was alive, and, if dead, to find the body. So I think that what took place Sunday night or Sunday morning and the trip up into Georgia was not out of line or unreasonable. As I understand, there are no statements that were taken at that time that would be used, anyway.
Now, frankly, I am concerned about this polygraph test. I am not knowledgeable of the technicalities and procedures and so forth, but what was given as a false answer was a patently true answer; that when he last saw her, she was alive; and there was no way it could have been anything else. And that was put down as a false statement.
Another thing, did he do anything to cause her death? And he said that was false. And, of course, it was true because she hadn't been killed.
And then to deliberately tell a falsehood as a basis for finding out whether a falsehood is going to be told somehow to me, doesn't add up.
But I don't understand that you are intending to use anything that grew out of this polygraph examination, but I do understand that the statements that were made to VanLandingham and Gandy were shortly after that. Is that true?
MR. RICHMOND: That's true, your honor. It was within an hour and a half, approximately, of the polygraph examination.
Now the statement, if I might clarify for the Court, the statement that she was dead was made the first time on the 11th and was cleared up on the night of the 11th. The statement made 
THE COURT: Does the evidence show that he did know she was alive?
MR. RICHMOND: Well, the evidence showed we didn't know what had happened to her, but we sure didn't know she was dead, like he had been told, at that point.
MR. DUVALL: Your honor, if I might, I believe Mr. Townsend testified that at the time of the second polygraph test he was told 
THE COURT: Well, he asked did he do anything to cause her death.
MR. RICHMOND: That's true.
THE COURT: And he said, "No," and he said that was a lie.

*1021 MR. RICHMOND: That's true.
THE COURT: What's true? Nothing is true about it.
MR. RICHMOND: He didn't tell him she was dead that day.
THE COURT: Did he tell him that they didn't know whether she was dead?
I'm going to suppress VanLandingham and Gandy's statement, but I'm going to admit the other one....
The arguments presented in this court by the State, in support of the trial judge's admission of the Thursday morning statement, appear to be primarily applicable to the question of whether there was evidence sufficient to establish threats, coercion or improper influences requiring exclusion of any statement or confession made by appellant. The State cites Florida precedents holding that deception and trickery alone will not invalidate a confession. Denmark v. State, 95 Fla. 757, 116 So. 757 (1928); Halliwell v. State, 323 So.2d 557 (Fla. 1975). Under the "totality of the circumstances" test, however, the use of deception, trickery, or misrepresentation is a factor to be considered. Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954); Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1968).
Mental or emotional disturbance resulting from the stress imposed by the predicament in which the accused finds himself, not induced by extraneous pressures, will not alone invalidate a confession. Ebert v. State, 140 So.2d 63 (Fla. 1962). It is clear, however, that coercion sufficient to invalidate a confession can be mental as well as physical. Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). This court recently held, in Hawthorne v. State, 377 So.2d 780 (Fla. 1st DCA 1979), that a confession was invalidated because it was produced by improper inducements and influences.
Although the constitutional inquiry into the issue of voluntariness "requires more than a mere color-matching of cases," Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961), we have given consideration to a number of cases involving successive confessions in order to become familiar with factors of significance in determining whether coercive influences invalidating prior confessions have been dissipated or removed. Among these factors are communication with counsel, or other persons from the outside world, or lack of it, during the intervening period between the coerced and subsequent confessions, Darwin v. Conn., 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968), Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 483 (1967); removal from the place where the improper coercion occurred, Lyons v. Okl., 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 148 (1943); giving a confession to persons other than those who participated in the preceding coercive activity, Lyons v. Okl. supra; the interval of time elapsing between the coercion and the subsequent confessions, U.S. v. Bayer, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947); and the presence or absence of restraints or relative freedom during the intervening period, U.S. v. Bayer, supra. It goes without saying that the extent or degree of the improprieties involved, and their effect upon the accused, will necessarily in every case be a factor in determining when such improper influences have ceased or become dissipated, and as to these matters the trial judge is in far better position than this court to make a judgment, particularly where the evidence is in conflict.
With these factors in mind, we further examine the evidence. During questioning early on Sunday morning following his arrest, appellant admitted being with the minor victim and volunteered to take the officers to the place in Georgia where he said he let her out of the car. The trip was made and appellant showed the officers the place. He was told that he was under arrest for possible kidnapping and murder. Later that day a tape recorded statement was given in which appellant related the events surrounding his meeting the girl and two other hitchhikers, a boy and a girl, near Daytona Beach, and driving with them to Quincy, Florida. In Quincy, while the boy and the other girl were buying food in a *1022 store, appellant drove off and left them. He denied knowing the young girl was in the back seat of his car until he stopped in Georgia, but he did advise the officers that he had left her there, unharmed.
Appellant's story was not believed by the investigating officers, and he was so informed. The officers were genuinely concerned that the girl might in fact be either dead, or perhaps seriously injured and in need of help. In any event, they offered and appellant apparently requested, a polygraph examination. He was questioned only briefly on Monday. During the first polygraph examination, on Tuesday, he was told that the girl was dead. According to his testimony, and that of the polygraph examiner, at this time he was already tired and exhausted. He had been repeatedly questioned and requested to tell the officers where the girl's body could be found. Appellant testified that he was threatened repeatedly with the electric chair. During the Wednesday polygraph examination, he was told that the polygraph had registered the fact that he had killed the girl. Appellant became frightened, upset, he broke down, screamed, begged for help and pleaded with the officers to believe he had not killed the girl. The intensity of the interrogation and its coercive effect upon appellant is evidenced, to some degree, by the testimony of the State's own witness who related appellant's false admissions to the effect that he remembered water, and putting some brush or brushes over the girl.
Investigators Gandy and VanLandingham began their Wednesday evening interrogation of appellant immediately following the polygraph examination which had already produced the dramatic breakdown referred to above. It was during this Wednesday evening questioning that appellant made his first admission of criminal conduct.
The polygraph examinations and the interrogation by the State Attorney's investigators were conducted in the State Attorney's office in Quincy. The Thursday morning confession, given in the presence of Sheriff Woodham and Captain Clark, was in the Sheriff's office, in the Gadsden County Courthouse, also in Quincy. Sheriff Woodham was present in the State Attorney's office on Tuesday evening, and had conversations with the appellant. Sheriff Woodham and Captain Clark were also present in the State Attorney's suite of offices when the second polygraph exam was given on Wednesday, although the record does not indicate their presence in the examining room at the time the test was being administered. It is clear that the City Police Department, State Attorney's office, and the Sheriff's office were all involved in the investigation from its beginning.
At no time, from the beginning of the interrogation at the time of his arrest, until after the Thursday confession, was appellant represented by counsel. It appears that counsel was appointed on April 19, 1978, six days after the confession. Although no issue is made of it on this appeal, we observe that the record before us does not show whether Rule 3.130, Florida Rules of Criminal Procedure, the "first appearance" rule, was complied with. There is an indication, based upon appellant's testimony that he was given a "bond hearing," and that he was given a first appearance. However, we are unable to determine whether defendant was properly advised of his right to counsel at the first appearance, or whether after being so advised, he waived counsel in writing, as required by the rule.
Summarizing, appellant was subjected to repeated and coercive interrogations over a period of four days, gave a confession which the trial court suppressed because of the improper influences producing it, and repeated his confession some twelve hours later in the same locality, before some of the same officers who were present during prior interrogations, without the benefit of counsel or the intervention, for that matter, of any other person not connected with the investigating officials.
We have noted the testimony of appellant, given at the suppression hearing, that he talked with everyone "voluntarily", and *1023 the testimony of the Sheriff, who stated that appellant appeared rested and relaxed prior to giving his Thursday morning statement. Beyond these circumstances, and the mere conclusory declarations by the witnesses that appellant's Thursday morning statement was freely and voluntarily made, we find no other articulable facts in the record to support the conclusion that the twelve-hour interval of time just prior to the Thursday morning statement was sufficient to dissipate the improper influences of the preceding days.
Because of our ruling on the confession issue, we find it unnecessary to address appellant's contention that the trial court erred in quashing the witness subpoena issued for the deposition of Assistant State Attorney, Hal S. Richmond. We further determine that the trial court did not err in denying appellant's motion for judgment of acquittal based upon insufficiency of the evidence.
For the foregoing reasons, the judgment of conviction is REVERSED and the cause is REMANDED for a new trial.
SHAW, J., and LILES, WOODIE A. (Ret.), Associate Judge, concur.