BENJAMIN PETROLIA, PETITIONER-APPELLANT, v. WARREN PINTO, SUPERINTENDENT OF NEW JERSEY STATE PRISON FARM, RAHWAY, NEW JERSEY, RESPONDENT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 31, 1960—Decided June 13, 1960.

Before Judges CONFORD, FREUND and HANEMAN.

*Mr. Joseph T. Ryan* argued the cause for petitioner-appellant.

*Mr. Archibald Krieger* argued the cause for respondent-respondent (*Mr. John G. Thevos,* Passaic County Prosecutor, attorney; *Mr. Anthony J. Armore,* Legal Assistant to Prosecutor, of counsel).

The opinion of the court was delivered by
FREUND, J. A. D. Petitioner Benjamin Petrolia appeals from a judgment of the Law Division, Passaic County, denying his application for a writ of *habeas corpus.*

In October 1954 petitioner was convicted of the crime of armed robbery committed on August 4, 1950. His appeal was dismissed by the Appellate Division as out of time. *State v. Petrolia,* 37 *N. J. Super.* 326 (*App. Div.* 1955). The New Jersey Supreme Court thereafter reversed the conviction and remanded for a new trial on the ground that petitioner's constitutional rights had been violated by the admission into evidence, over defense counsel's objection, of a written confession which had been obtained on August 7, 1950 involuntarily and by reason of "unlawful physical

applications" on the part of the police. 21 N. J. 453 (1956). The facts concerning the hold-up and the giving of the confession are stated in the opinion last cited.

Petitioner was retried in September 1956 and convicted of the same offense, armed robbery. On appeal to the Appellate Division, it was urged principally that the trial judge had erred in instructing the jury with respect to Petrolia's flight to Chicago after arrest and before the first trial. The judgment was affirmed. 45 N. J. Super. 230 (App. Div. 1957), certification denied 25 N. J. 43 (1957). Petitioner applied to the United States Supreme Court for a writ of certiorari, which was denied. 355 U. S. 942, 78 S. Ct. 431, 2 L. Ed. 2d 422 (1958).

At the retrial, the State did not offer into evidence the written confession which had been used at the first trial. However, the State called, among other witnesses, Officers Dworak, Murphy and O'Brien who did testify that Petrolia, on August 7, 1950 and in their presence, had orally admitted taking part in the robbery. Petitioner argues that since the admission of guilt made in the presence of these officers was made at the same time and as part of the same general occurrence as concerned the giving of the written confession, which was held to have been extracted by force and violence, his oral admission was as untrustworthy as the confession and that, as a result, the second conviction is as constitutionally vulnerable as the first.

The seemingly anomalous feature of the present collateral attack on the judgment is that, when the State's witnesses did testify as to the petitioner's admission of participation in the hold-up, the same counsel who had defended at the first trial and who had just succeeded in obtaining a reversal of the first conviction because of the coerced confession, did at no time object to or move to strike such testimony. The charge of the court to the jury, which did not in any way refer to the admissions made by the defendant, was said by defense counsel to be a "most commendable" one, except as to the reference therein to the accused's flight. And,

neither on appeal to this court nor in the petitions for certification to our Supreme Court and the United States Supreme Court was any question raised, as grounds for review, regarding the defendant's oral admissions as testified to by the police officers. The denial of the petition for *certiorari* by the United States Supreme Court took place February 3, 1958. Only seven days later petitioner applied to the United States District Court for the District of New Jersey for a writ of *habeas corpus*, thereby raising for the first time the ground he presently advances. (That court is holding petitioner's application "in abeyance" in order to afford him an opportunity to exhaust state remedies with regard to the issue.)

We do not rest our conclusion in this matter on the reasons stated by the Law Division judge for denying petitioner's application for a writ. The court below was first persuaded that "whether or not the oral admissions and confessions of Petrolia were voluntary or * * * the product of police brutality, certainly, presented a fact question to be determined by the jury" and that the court's charge had left to the jury all issues of fact. In our opinion, however, it would have been error for the court in which defendant was retried to have permitted the jury to find as a matter of fact that the admissions or confessions were voluntarily made; that matter had been conclusively determined in defendant's favor by the Supreme Court on appeal from the first conviction. In any event, the voluntariness of the admissions and confessions was not submitted to or decided by the jury in the second trial.

The Law Division also found that the action of the trial court in admitting into evidence the officers' testimony regarding Petrolia's oral admissions to them was at most a mere trial error and hence not reviewable on a writ of *habeas corpus*. *State v. Mastic,* 20 *N. J.* 428, 430 (1956). In *State v. Jacobson,* 28 *N. J. Super.* 226, 230 (*App. Div.* 1953), it was held in specific regard to the voluntariness of a confession: "The admissibility thereof cannot be reviewed

by *habeas corpus* proceedings, but only by appeal." Compare *State v. Cynkowski,* 10 *N. J.* 571, 576, 577 (1952).

We shall assume without deciding, however, that the petitioner is not barred as a procedural matter by the failure to raise the asserted trial error on appeal, and that a denial of the application cannot be posited on the single narrow ground that the writ may not be used as a substitute for appeal. We shall also assume that the oral admissions of guilt were not made until the police began to beat the petitioner and that there was such an interconnection between the coerced confession and the oral admissions as to require the conclusion that it would have been, in ordinary circumstances, a violation of due process to have admitted either. *Leyra v. Denno,* 347 *U. S.* 556, 74 *S. Ct.* 716, 98 *L. Ed.* 948 (1954). *Cf. State v. Guild,* 10 *N. J. L.* 163, 180 (*Sup. Ct.* 1828).

 Notwithstanding the foregoing, we conclude that the writ was properly denied by the Law Division. In our judgment, the failure of the defendant to raise an objection in any manner to the admission of this testimony when it was adduced, or to move to strike it, or to request a charge on the subject of voluntariness of the admissions or on the weight to be given them, or to raise the question in three different appellate tribunals, including the United States Supreme Court—while assumedly not in and of itself sufficient to warrant a denial of relief—is nevertheless rationally explainable only on the basis that the point was deliberately waived by the defendant; whether for purposes of his over-all defense strategy or otherwise is immaterial.

The defendant's consent to the jury's consideration of the officers' testimony is made clear by examining what actually took place at the trial. After Detective Sergeant Dworak said on direct examination that Petrolia "admitted taking part in the hold-up" subsequent to his having been identified in a line-up by his two confederates, defense counsel eagerly explored on cross-examination the circumstances of the de-

fendant's "conference" with the police that night. Petrolia's attorney conducted the following examination:

"Q. When you were present at the verbal inquiry, when Chief Murphy. Captain O'Brien, you, and Cohn were questioning him as to his participation in the robbery, didn't he say, 'I had nothing to do with it, I got nothing to tell you'? Isn't that true? A. At the beginning.

Q. At the beginning? A. That is right, sir.

Q. How long did he insist during that verbal conference that he had nothing to do with any incrimination or culpability? A. A few minutes.

Q. Now, weren't you present when Captain O'Brien took out a religious medal and said to this defendant, 'I am a very religious man. Do you see this medal, religious medal? I am sorry I am going to have to do to you what is going to happen, but you give me no alternative'? Didn't that happen?"

Captain Daniel Murphy of the Paterson Police Department testified for the State that after the two other participants in the hold-up definitely made the identification on the evening of August 7, Petrolia still denied complicity. "After questioning for some time," Petrolia said he did not "like to admit it" because he was afraid of other persons he would have to involve, but he later "consented to give a statement."

Defense counsel on cross-examination pressed Captain Murphy for all the facts concerning the police interrogation of Petrolia, not only seeking to establish to the satisfaction of the second jury that the defendant had been abused by the police but also what had been said by him during that inquiry. It was counsel's purpose to prove that even though Petrolia had been brutally beaten, he had steadfastly denied his guilt until an admission was forced out of him. Thus:

"Q. Will you tell the Court and jury, please, what happened from the moment that you came in the room? First name who were there and then what happened from the moment that you came into the room. A. There was Lieutenant O'Brien, Detective Sergeant Dworak, Sergeant Cohn, and Lenny Roemer, our stenographer. They had been talking to these boys, and they came and told me that he was denying any knowledge of the hold-up. At that time I went into the room and I spoke to him. These fellows told him

right in front of me that he was the man that procured the—set the thing up for them, drove them over here, and so forth. So I spoke to Petrolia and I asked him· how he could deny any knowledge of it on such accusations.

Q. In the presence of all of you? A. In the presence of everyone. And he still denied it, and after denying it for some time he told me it was foolish to deny it with such evidence against him, and he finally admitted it.

Q. How long had he been denying it? Since he came in the room? A. Well, that I don't know. I wasn't there. They had him in custody from approximately four-thirty.

Q. Please listen to the question, Chief. How long did Benjamin Petrólia deny that he was involved since you came in the room? A. Oh, possibly fifteen minutes.

Q. Fifteen minutes? A. Yes.

Q. Do you know how long he had been denying that he was implicated when O'Brien, Dworak, Cohn, and Roemer were in the room? A. No, I do not.

Q. You did not. Now, isn't it a fact, Chief, that when you came into the room that Lieutenant O'Brien said to you, 'This fellow says he knows nothing. This fellow is not cooperative. This fellow denies everything.' Then wasn't there a recess, an interruption, and didn't the oral conference discontinue? Yes or no. A. No, it did not.

Q. Isn't it a fact, Chief, that when you heard that from Lieutenant O'Brien you saw Lieutenant O'Brien take out a cloth religious medal and say to Petrolia in your presence, 'You see this religious medal? I am a very religious man. I am sorry I am going to have done to you what is going to be done, but you are asking for it,' and then didn't Lieutenant O'Brien and Cohn and Detective Sergeant Dworak go up the steps to a third-floor room, and wasn't he pushed in that room where four or five officers blackened his two eyes, bloodied his ear, knocked him unconscious, threw water on him, and then afterwards he was brought back into this room where you walked into the first time? Isn't that true?

&ast;　　&ast;　　&ast;　　&ast;　　&ast;　　&ast;　　&ast;　　&ast;

Q. Now, isn't it a fact that during the fifteen-minute period that you say he was denying that he had anything to do with this, denying that he had any connection with this complicity, and then you say he admitted it, didn't he then have the two black eyes and a bloody ear? A. No, he did not."

After Detective Sergeant John Thomas O'Brien testified on direct that Petrolia "gradually definitely, eventually * * * came around to admitting the situation," he too was asked by defense counsel whether it was not "a fact that when he finally did incriminate himself he was put through all of this brutality * * *."

We conclude from the foregoing that at the trial the defense waived its objection to the officers' testimony concerning Petrolia's admissions, so as not only to bolster its contention that he took flight to escape police brutality, but to establish that he had denied guilt even under trying circumstances and until he was able to deny no longer. It may well have been the intended strategy to elicit an acquittal through development of sympathy for the defendant. It would involve the most shocking trifling with the judicial process to permit the defendant now to prevail in this collateral attack upon the fairness of the use of his admissions of guilt when that use was deliberately acquiesced in by him, when the subject matter was exploited by the defendant without raising the question of error at any time throughout the whole trial and the ensuing appeals, and when, after affirmance of the conviction, the point was immediately raised, as though held in reserve, on an application for writ of *habeas corpus*. The present charge does not go to a fundamental illegality suddenly discovered by the defendant but to a point which was implicit all through the proceedings, the very trial being the result of a reversal of a previous conviction on the identical ground now urged.

Defendant was accorded a fair trial and his conviction was not obtained by unconstitutional means; it is entirely unreasonable to believe that the result would have been different if the evidence complained of had been excluded. The evidence of his guilt of the offense he was twice convicted for is overwhelming.

No constitutional right of the defendant was violated without his consent. In the light of the entire history of this prosecution, we do not have projected before us a proceeding fundamentally unfair or shocking to a sense of justice.

Judgment affirmed.