ACCEPTED
01-14-00335-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
2/9/2015 4:11:36 PM
CHRISTOPHER PRINE
CLERK

No. 01-14-00335-CR & 01-14-00336-CR

_____

In the First Court of Appeals Houston, Texas

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
2/9/2015 4:11:36 PM
CHRISTOPHER A. PRINE
Clerk

_____

DAMION GENTRY, Appellant


V.


THE STATE OF TEXAS, Appellee

_____

On Appeal from the 240th Judicial District Court
Of Fort Bend County, Texas
Cause No. 12-DCR-061920 & 12-DCR-061921

_____

APPELLANT'S BRIEF


_____

Michael C. Diaz
20228 Hwy. 6
Manvel, Texas 77578
Telephone: 281-489-2400
Facsimile: 281-489-2401
Texas Bar No. 00793616
mjoeldiaz@sbcglobal.net
Attorney for Appellant

<u>APPELLANT REQUESTS ORAL ARGUMENT</u>

<u>STATEMENT REGARDING ORAL ARGUMENT</u>

Pursuant to the Texas Rules of Appellate Procedure 9.4(g) and 38.1(e), Appellant requests oral argument to benefit this Court for the following reasons:

Appellant contends that the juvenile court's reasons for certifying Appellant were insufficient and abused its discretion.

The trial court committed reversible error and abused its discretion in denying Appellant's motion to suppress his written statement.

The evidence is insufficient to support Appellant's conviction for aggravated robbery in cause number 12-DCR-61921.

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Tex. R. App. P. Rule 38.1 (a), appellant certifies that the following is a complete list of the parties to the final judgment and the names and addresses of counsel in the trial and on appeal:

Appellant:

Damion Gentry

Counsel for Appellant:

Michael C. Diaz (at trial and appeal)
20228 Hwy. 6
Manvel, Texas 77578

Brian M Middleton (at trial)
7322 Southwest Freeway, Suite 1980
Houston, Texas 77074

Counsel for the State of Texas:

John F. Healey Jr.-District Attorney
Tyra McCollom-Trial
Stuti Patel-Trial
John Harrity-Appeal
Fort Bend County, Texas District Attorney's Office
1422 Eugene Heimann Cir
Richmond, Texas 77469

Trial Judge:

The Honorable F. Lee Duggan-Visiting
Presiding Judge 240th District Court
Fort Bend County, Texas

# TABLE OF CONTENTS

STATEMENT REQUESTING ORAL ARGUMENT……………………………..ii

IDENTITY OF PARTIES AND COUNSEL…………..………………………iii

TABLE OF CONTENTS……………………………………………………….iv

INDEX OF AUTHORITES……………………………………………….v, vi

STATEMENT OF THE CASE………………………………………….…1

STATEMENT OF ISSUES PRESENTED………………………………...2

STATEMENT OF FACTS…………………………………………….…...3

SUMMARY OF THE ARGUMENT…………………………………………..14

ARGUMENT/POINT OF ERROR ONE…………………………………...15

ARGUMENT/POINT OF ERROR TWO…………………………...…23

ARGUMENT/POINT OF ERROR THREE…………………………...30

CONCLUSION AND PRAYER FOR RELIEF………………………………..34

CERTIFICATE OF COMPLIANCE…..………………………………36

CERTIFICATE OF SERVICE...………………………………………….37

## CITATION TO THE RECORD

Certification Hearing……………………………………...…… "CH & page"

Suppression Hearing……………………………………………. "SH & page"

# INDEX OF AUTHORITIES

CASES:

*Brooks v. State,* 323 S.W.3d 893, 901-02 (Tex. Crim. App., 2010)………………..31

*Brown v. Illinois,* 422 U.S. at 601, 95 S.Ct. at 226…………………………....27, 28

*In The Matter of L.R.S.,* 573 S.W.2d 888 (Tex.Civ.App-Houston [1 Dist] 1978)……………………………………………………………...…27-30

*Jackson v. Virginia,* 443 U.S. 307, 319 (1979)…………………………………….30

*Kent v. United States,* 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966)……17-18

*Laster v. State,* 275 S.W.3d 512, 517 (Tex.Crim.App.2009)…………………..30

*Leyra v. Denno,* 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 1079 (1954)………….29

*Moon v. State,* PD-1215-13………………………………………………17-18

*R. C. S. v. State of Texas,* 546 S.W.2d 939 (Tex.Civ.App.1977, no writ)……...27

*United States v. Bayer,* 331 U.S. 532 (1947)…………………………………….29

*Williams v. State,* 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)………………..31

*Wong Sun v. U. S.,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1962)…….26-28

CODES, RULES AND CONSTITUTIONAL PROVISIONS:

Tex.                 Fam.                 Code                 Sec 51.09……………………………………………………………23

Tex. Fam. Code Sec 51.095…………………………………...…..23-24, 26, 28-29

Tex. Fam. Code Sec 54.02…………………………………………………15-18, 29

Tex. Code Crim. Proc., Art. 38.23…………………………………………………..24

Tex. Penal Code 29.01……………………………………………………….....31

Tex. Penal Code 29.02……………….………………………………..……….31

Tex. Penal Code 29.03……………………………………………………….32

Tex. R. App. 9.4(g)…………………………………………………………...ii

Tex. R. App.9.4 (i) 3…………..………………………………………………..35

Tex. R. App. 38.1(a)……………………………………………….…………iii

Tex. R. App. 38.1(e)……………………………………………….……..ii

## STATEMENT OF THE CASE

On November 15, 2012, Damion Gentry was certified to stand trial as an adult. On November 26, 2012, Damion Gentry, appellant, was indicted for felony offenses of aggravated robbery. (CR 1 at 16). On April 8, 2014, appellant pled not guilty to the indictments. (CR 21 at 12). After a jury trial, the jury found appellant guilty of the charged offenses and appellant was assessed two 50 year sentences in the Texas Department of Criminal Justice-Institutional Division. (CR 1 at 102).

On April 17, 2014, Appellant timely filed his notice of appeal. (CR 1 at 97).

## ISSUES PRESENTED

## POINT OF ERROR ONE

Appellant contends that the juvenile court's reasons for certifying Appellant were insufficient and abused its discretion.

## POINT OF ERROR TWO

The trial court committed reversible error and abused its discretion in denying Appellant's motion to suppress his written statement.

## POINT OF ERROR THREE

The evidence is insufficient to support Appellant's conviction for aggravated robbery in cause number 12-DCR-61921.

## STATEMENT OF FACTS

On January 19, 2012, at approximately 3 a.m., Masario Garza, who was 68 years old at the time, was on his way to work at National Oil in Houston. Garza would took the same route to work, which was down old Highway 90, then turn on Harlem road to FM 1093, and then get to Highway 6 and all the way to West Little York. As Garza began slowing down in the outside lane, and approaching a red light at FM 359, which intersects with Highway 90, a gray or silver truck passed him on the inside lane. The truck came to a stop and a young, light skinned, Spanish boy, maybe in his late teens, gets out of the passenger side of the truck with a gun in his right hand. Garza stepped on the gas and took off, thinking he was going to get robbed. The boy shot into Garza's driver window two times. Garza continued to travel on Highway 90 at a high rate of speed and called 911. The truck followed Garza at a high rate of speed also. Garza heard two more shots fired as the truck caught up with him and pass him. Eventually the truck turned back in the opposite direction and Garza heard two more shots fired as the truck traveled away at a high rate of speed. Garza suffered cuts on his cheek, ear lobe and hand. (RR at 6-34). On cross-examination, Garza testified that he never stopped his vehicle and that there was no dialogue ever exchanged with the person who shot at him. Moreover, Garza assumed that this person was going to rob him. (RR 6 at 35-42).

Nelson Alberto Mejia Escobar was working in the parking lot of Academy in the early morning when he observed a gray F-150 truck driving toward him without its headlights. Escobar said there were two Hispanic males in the truck and the passenger, who appeared to be a 15 or 16 years old, got out of the truck telling Escobar in Spanish, to give him $150. Escobar said this person had a black firearm in his right hand pointing it at Escobar's head. Escobar empties his pockets and takes his keys out while the passenger is pointing the gun at different parts of Escobar's body. The passenger then asks Escobar for his keys and gets them from Escobar. Escobar is begging for mercy not to get shot. The passenger then strikes Escobar's hand with the gun and starts shooting at Escobar three or four times. Escobar takes off running and trips and falls, thinking he has been shot. Escobar hears the passenger say, "I already killed him," and the passenger gets in the truck and the truck leaves. (RR 5 at 6-40).

Officer James Thompson went by an apartment complex, which was under construction, looking for a suspicious vehicle. The apartment complex was located behind Academy. Thompson heard three or four rapid gunshots coming from the general area of Academy parking lot. Thompson then heard tires squealing and observed a 2-door gray Ford pickup truck leaving the parking lot at a high rate of speed running a stop sign and crossing over toward FM 762. Thompson maintained visual contact with the gray truck, except for a brief second, as there

4

were no other cars around at the time. Thompson eventually got behind the gray truck and activated his dash camera thirty seconds before he turned on his overhead lights. The gray truck comes to a stop on the wrong side of the street, directly in front of the driver's house. As Thompson exits his patrol car, the passenger exits the truck and Thompson commands the passenger to get back in the truck. Thompson had the driver walk back to him for safety reasons and began asking the driver general questions. At this time, Thompson receives a dispatch referencing a shooting so he draws his weapon, ordering the driver to ground and orders the passenger out of the truck and onto the ground also. The two suspects begin talking in Spanish to one another and the passenger gets up off the ground, moving to the front of the truck while Thompson loses sight with him but regains it. Thompson observed the passenger run away northbound from the scene. Once Thompson inventories the truck, he finds the keys that belonged to Escobar.

Detective Leonhardt was called out to the stop location. Leonhardt watched the in-car video and knew the passenger as the Appellant. Once Leonhardt determined that it was Appellant on Thompson's in-car video, he was able to locate an address for the Appellant in Richmond. At 9 a.m. Leonhardt, Lieutenant Dunn, Detective White and Detective Eder arrive at Appellant's residence. Appellant's stepfather let them in and they proceeded to the back of the trailer where they found Appellant exiting the bathroom and detained him. Appellant's

stepfather gave the officers consent to search the trailer for the firearm. Appellant made a statement that the gun was thrown out of the truck in front of the subdivision where they were stopped. Leonhardt then transported the Appellant to Judge Ward's office to be given his magistrate warnings in order to obtain a statement.

The Appellant was certified to stand trial as an adult on November 15, 2012. At the certification hearing, the State called Dr. Karen Gollaher to testify. Dr. Gollaher testified on cross examination as follows:

Q. You said, if found true, you recommend that Damion enter into secure facility and have structured regimen with a behavior modification plan in place. This plan will allow him to establish a pattern of pro-social behavior and establish more self-discipline. Do you agree with that?

A. Yes, sir.

Q. You mind hasn't changed on that?

A. No, sir. That's the best shot that we have, just to attempt something with him. (RR, CH 1 at 357).

Q. Okay. Do you agree with Dr. Axelrod in his conclusion that the Court must seriously address the likelihood for rehabilitation for Damion Gentry?

A. I think that this young man could use rehabilitation where that happens and how that happens, you know, I may differ with him on it. (RR, CH 1 at 361).

Q. Do you know if the state penitentiary provides rehabilitation, or if that is for punishment?

A. I know there's some treatment components in it, but I can't say that I'm familiar with what all of those are today.

Q. So you can't give me a yes or no on that?

A. That's correct. (RR, CH 1 at 361).

Q. I'm not asking about time in any facility or wherever that's going to be, but you agree with me that he does need rehabilitation, correct?

A. Yes, he needs help. (RR, CH 1 at 364).

At the certification hearing, the Appellant called Dr. Axelrad to testify on direct examination which was as follows:

Q. And what is -- what was Dr. Polluck's findings as far as Damion is concerned, whether he felt like rehabilitation would be something that would be additional for Damion?

A. He felt that rehabilitation would be a something that could be of a significant assistance to him.

Q. What have you been asked by this Court?

A. I have been asked by this Court to provide information relating to whether or not this patient has psychiatric problems, which can be treated.

Q. And have you found that there are problems with Damion, and can they be treated?

A. I have found problems that can be treated, Dr. Polluck has found problems that can be treated. And he's being treat for those problems in juvenile hall right now. (RR, CH 2 at 105-106).

Q. And from your evaluation of Damion, and you understand what the Court has to decide on concerning Damion, can you give you the Court your opinion about Damion's situation in this certification hearing?

A. I believe that he's got a treatable condition in terms of bipolar disorder. Dr. Anity, as recently as last night, agreed with this opinion when we had this discussion. He has had significant response to both the Depokate and Abilify and his bipolar and behavior problems have improved as a result of the treatment that Dr. Anity is providing him. I also have an opinion based on upon Dr. Polluck

8

correspondence with me and my phone conversations with him that Damion will be able to be provided cognitive rehabilitation in a juvenile setting depending on what the Court decides here; and that's also is going to have a significant positive effect in term of rehabilitation?  (RR, CH 2 at 114).

At the conclusion of the certification hearing, the trial court made the following findings:

That the offense was against the person.  That you are sufficiently sophisticated and mature enough to be tried as an adult.  You are sufficient enough to help your attorney in your defense.  That you have a record, and your previous history is such that you should be certified to stand trial as an adult.  The public cannot be protected if you remain in the juvenile system. And there's a likelihood that the juvenile system could rehabilitate you is very remote. I think juvenile has tried just about everything they could to help you.  The fact that the alleged offenses were felony of the first degree, and that you were 14 years of age when you committed those felonies.   There has been no adjudication of the two felonies. And because of the seriousness of the alleged offenses, the public cannot be protected if you remain in the juvenile system.  Because of the background, the public cannot be protected if you remain here.  I find based on your social

9

evaluation and investigative report and your psychological evaluation that you should be certified to stand trial as an adult. (RR, CH 2 at 177-178).

During a motion to suppress hearing, the State called four witnesses. The first witness, Judge Mary Ward, administered Appellant his warnings in order for the police to obtain his statement at her office. Ward testified that Appellant acknowledged that he understood his warnings and gave an audio statement and a written statement which was the basis of the suppression hearing. (RR, SH 1 at 5-14).

The next witness, Detective Leonhardt testified on direct examination as follows:

Q. Okay. So those warnings, his warnings aren't part of that recording, are they?

A. No, sir.

Q. Okay. But you started talking to him and started asking him questions without those warnings on the recording; is that correct?

A. After I asked him if he remembered the rights and he told us he did, then that's when we started questioning him.

Q. Yes, sir. But my question is, those warnings aren't part of the recording, are they?

A. No.  (RR, SH 1 at 40).

Leonhardt also testified to the written statement as follows:

Q. Now, during the course of that interview with Damion that was recorded, there is mention of him writing a statement out; isn't that correct?

A. Yes, sir.  (RR, SH 1at 43).

Q. Okay. And you can hear conversations going on between you, Detective McKinnon, and Detective Dunn, and Damion regarding the written part, right?

A. I believe so.  (RR, SH 1 at 43).

Q. So the written part derives from his oral recorded statement, right?  It's on there, right?

A. Correct.  (RR, SH 1 at 75).

The State's third witness was Lieutenant Tracie Dunn, testified on direct examination as follows:

Q. Okay. And did you tell him what to put down, as far as the car or the truck?

A. I don't recall not that specific, no.

Q. Okay. Did you tell him, you just can't say such-and-such, you have to say your friends were getting gas and you wait. Were you getting into details?

A. I don't recall getting into details, no, sir.

Q. You don't?

A. No, sir.

Q. Okay. And did you tell him, Make sure you got everything about the car? Do you remember making those statements to him as he is writing this written statement? (RR, SH 1at 80-81).

Q. Okay. And the recording would be the best evidence of that?

A. Sure. (RR, SH 1 at 81).

On cross examination, Dunn testified as follows:

Q. Okay. The written statement that's admitted is State's Exhibit No. 1 is the creation of that document also evident on the oral statement?

12

A. Yes.

Q. All right. So in that regard, they're created simultaneously?

A. Correct. (RR, SH 1 at 89).

The State's fourth witness, Detective McKinnon testified on cross examination as follows:

Q. Was -- was the gun ever found?

A. No.

Q. The gun wasn't found and the written statement comes later on than the audio; is that correct?

A. That's correct.

Q. It's not right up front, but it's later after the question and answer, the dialogue is already taken place for an hour?

A. That's correct. After we do the dialogue, we take the written statement. (RR, SH 1 at 109-110).

## SUMMARY OF THE ARGUMENT

### Point of Error One

Appellant contends that the juvenile court's reasons for certifying Appellant were insufficient and abused its discretion.

### Point of Error Two

The trial court committed reversible error and abused its discretion in denying appellant's motion to suppress his written statement.

### Point of Error Three

The evidence is insufficient to support Appellants conviction for aggravated robbery in cause number 12-DCR-61921.

ARGUMENT

POINT OF ERROR ONE:

Appellant contends that the juvenile court's reasons for certifying Appellant were insufficient and abused its discretion.

Section 54.02 of the Texas Family Code states: (a) The juvenile court may waive its exclusive original jurisdiction and transfer a child to the appropriate district court or criminal district court for criminal proceedings if:

(1)  the child is alleged to have violated a penal law of the grade of felony;

(2)  the child was:

(A)  14 years of age or older at the time he is alleged to have committed the offense, if the offense is a capital felony, an aggravated controlled substance felony, or a felony of the first degree, and no adjudication hearing has been conducted concerning that offense; and…

(3) after a full investigation and a hearing, the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense alleged or the

15

background of the child the welfare of the community requires criminal proceedings.

In making the determination required by Subsection (a) of this section, the court shall consider, among other matters:

(1)  whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

(2)  the sophistication and maturity of the child;

(3)  the record and previous history of the child;  and

(4)  the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

If the juvenile court waives jurisdiction, it shall state specifically in the order its reasons for waiver and certify its action, including the written order and findings of the court, and shall transfer the person to the appropriate court for criminal proceedings…

Appellant contends that the juvenile court's findings do not support its decision to certify Appellant in this case.

In *Kent*, the United States Supreme Court characterized the statutory transfer proceedings in the District of Columbia as "critically important" and held that any statutory mechanism for waiving juvenile-court jurisdiction must at least measure up to the essentials of due process and fair treatment." *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). We hold that it is incumbent upon the Juvenile Court to accompany its waiver order with a statement of the reasons or considerations therefor. *Id*.

In order to transfer a juvenile to criminal court, the juvenile court must consider all of the *Kent* factors as currently codified in Section 54.02(f) of the Juvenile Justice Code. *Moon v. State*, PD-1215-13.

The juvenile courts reasons for transfer to criminal court were insufficient based upon the evidence presented under Section 54.02(f).

<u>Offenses Against Persons</u>

Although Appellant was charged with two aggravated robberies, this alone cannot be a valid reason alone for certification. Section 54.02 requires a full investigation, which includes a complete diagnostic study, social evaluation, and full investigation of the child, his circumstances and the circumstances of the alleged offense and a then the hearing. The courts of appeals have long held that

17

the offense that the juvenile is alleged to have committed, so long as it is substantiated by evidence at the transfer hearing and of a sufficiently egregious character, will justify the juvenile court's waiver of jurisdiction regardless of what the evidence may show with respect to the child's background and other Section 54.02(f) factors. This is different from holding that the mere category of offense the juvenile is alleged to have committed, without more, will serve to justify transfer. If that is the only consideration informing the juvenile court's decision to waive jurisdiction; the category of crime alleged, rather than the specifics of the particular offense; then we agree with the Supreme Court's intimation in *Kent* that the transfer decision would almost certainly be too ill-informed to constitute anything but an arbitrary decision. *Moon v. State*, PD-1215-13.

Appellant was charged with two aggravated robberies, in which there were two different victims. However, the nature of the charge alone is insufficient for certification. Moreover, the offenses were committed within an hour of one another.

<u>Sophistication and Maturity</u>

Dr. Axelrad testified at the certification hearing on direct examination as follows:

18

Q. What's your opinion about Damion's maturity and sophistication from your evaluations?

A. Damion Gentry is an adolescent who has a relatively severe bipolar disorder. He has this disorder, and he has had this disorder probably for the past five years, based on the history he shared with me. He has a history of several head injuries. And those head injuries may very well be the reason in part for the neuropsychological deficits that Dr. Polluck has diagnosed in this case, that he has incorporated in two reports to me and to the court? So because of the problems that he's experiencing neuropsychiatrically, he is impaired. He is psychiatric and psychologically impaired. So if you're going to utilize the word maturity and sophistication in a medical context or clinical context, he has a brain that has been injured. (RR, CH 2 at 104-105).

The evidence clearly showed Dr. Axelrad, a psychiatrist, for over 40 years, testified that Appellant suffered from head injuries and neuropsychological deficits that are involving the same areas of the brain that have not been fully matured or developed or mamelonated. (RR, CH 2 at 91).

Record and Previous History of Child

Appellant's record and previous history was minimal and non-violent. The state's witness, Shane Marvin testified at the certification that Appellant was first involved with their department at age 10. (RR, CH 2 at 10). Appellant was on probation for one year for the offense of assault on a public servant, from May 28, 2009 to May 27, 2010. Marvin clarified during trial that this was an assault on Appellant's teacher while in special education classes. (RR 11 at 145). Marvin testified that Appellant successfully completed this probation. (RR, CH 2 at 37). Appellant was placed on probation, a second time, on December 27, 2010, for membership or gang solicitation, a class C offense, until June 26, 2011, which he successfully completed. (RR, CH2 at 34, 39). In addition, Appellant was sent to Riverside Substance Abuse Center and to the Juvenile Boot Camp Program, as conditions of his probation. (RR, CH 2 at 63). In addition, Marvin testified that his department's recommendation was TJJD or Texas Juvenile Justice Department. (RR, CH 2 at 63).

Appellant lacked a criminal history subject to certification. Appellant successfully completed two probations as a juvenile, for offenses which were not egregious in nature. Furthermore, Marvin's recommendation was to send Appellant to TJJD, which is one avenue that was never exhausted in the juvenile system.

## Likelihood of Rehabilitation

The state's expert, Dr. Karen Gollaher testified that Appellant could be rehabilitated by her own testimony which is as follows:

Q. Okay. Do you agree with Dr. Axelrod in his conclusion that the Court must seriously address the likelihood for rehabilitation for Damion Gentry?

A. I think that this young man could use rehabilitation where that happens and how that happens, you know, I may differ with him on it. (RR, CH 1 at 361).

Q. Do you know if the state penitentiary provides rehabilitation, or if that is for punishment?

A. I know there's some treatment components in it, but I can't say that I'm familiar with what all of those are today.

Q. So you can't give me a yes or no on that?

A. That's correct. (RR, CH 1 at 361).

Q. I'm not asking about time in any facility or wherever that's going to be, but you agree with me that he does need rehabilitation, correct?

A. Yes, he needs help. (RR, CH 1 at 364).

Gollaher conceded at the certification hearing that Appellant does need rehabilitation. Furthermore, Dr. Axelrod testified as follows;

Q. And what is – what was Dr. Polluck's findings as far as Damion is concerned, whether he felt like rehabilitation would be something that would be additional for Damion?

A. He felt that rehabilitation would be a something that could be of a significant assistance to him.

Q. What have you been asked by this Court?

A. I have been asked by this Court to provide information relating to whether or not this patient has psychiatric problems, which can be treated.

Q. And have you found that there are problems with Damion, and can they be treated?

A. I have found problems that can be treated, Dr. Polluck has found problems that can be treated. And he's being treat for those problems in juvenile hall right now. (RR, CH 2 at 105-106).

Q. And from your evaluation of Damion, and you understand what the Court has to decide on concerning Damion, can you give you the Court your opinion about Damion's situation in this certification hearing?

A. I believe that he's got a treatable condition in terms of bipolar disorder. Dr. Anity, as recently as last night, agreed with this opinion when we had this discussion. He has had significant response to both the Depokate and Abilify and his bipolar and behavior problems have improved as a result of the treatment that Dr. Anity is providing him. I also have an opinion based on upon Dr. Polluck correspondence with me and my phone conversations with him that Damion will be able to be provided cognitive rehabilitation in a juvenile setting depending on what the Court decides here; and that's also is going to have a significant positive effect in term of rehabilitation? (RR, CH 2 at 114).

All three experts agreed and it is undisputed from the record that Appellant should benefit from rehabilitation and these problems could be treated and did require treatment. As a matter of fact, Appellant was responding to medication given to him at the detention facility. Furthermore, the juvenile court stated in it reasons for certification, that there's a likelihood that the juvenile system could rehabilitate you is very remote. Although remote, based upon this reason, it does appear there was some chance the juvenile system could have rehabilitated

23

Appellant. (RR, CH 2 at 177-178).We will never know. Certification should be the last option for any child, who was 14, at the time he committed these offenses, based upon the testimony at the certification hearing.

## ARGUMENT

## POINT OF ERROR TWO:

The trial court committed reversible error and abused its discretion in denying appellant's motion to suppress his written statement.

Sec. 51.095. ADMISSIBILITY OF A STATEMENT OF A CHILD. (a) Notwithstanding Section 51.09, the statement of a child is admissible in evidence in any future proceeding concerning the matter about which the statement was given if:…

(5) subject to Subsection (f), the statement is made orally under a circumstance described by Subsection (d) and the statement is recorded by an electronic recording device, including a device that records images, and:

(A) before making the statement, the child is given the warning described by Subdivision (1)(A) by a magistrate, the warning is a part of the recording, and the child knowingly, intelligently, and voluntarily waives each right stated in the warning;…

Art. 38.23. EVIDENCE NOT TO BE USED. (a) No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case…

Appellant's written statement derives from the illegally obtained audio recording which was suppressed during a motion to suppress hearing. (RR, SH 2 at 25). Furthermore, during the suppression hearing, Leonhardt testified to the written statement as follows:

Q. Now, during the course of that interview with Damion that was recorded, there is mention of him writing a statement out; isn't that correct?

A. Yes, sir. (RR, SH 1at 43).

Q. Okay. And you can hear conversations going on between you, Detective McKinnon, and Detective Dunn, and Damion regarding the written part, right?

A. I believe so. (RR, SH 1 at 43).

Q. So the written part derives from his oral recorded statement, right? It's on there, right?

A. Correct. (RR, SH 1 at 75).

On cross examination, Dunn testified as follows:

Q. Okay. The written statement that's admitted is State's Exhibit No. 1 is the creation of that document also evident on the oral statement?

A. Yes.

Q. All right. So in that regard, they're created simultaneously?

A. Correct. (RR, SH 1 at 89).

McKinnon testified at the suppression hearing as follows:

Q. The gun wasn't found and the written statement comes later on than the audio; is that correct?

A. That's correct.

Q. It's not right up front, but it's later after the question and answer, the dialogue is already taken place for an hour?

A. That's correct. After we do the dialogue, we take the written statement. (RR, SH 1 at 109-110).

This testimony from the suppression hearing clearly shows that the written statement was taken simultaneously during the recording of the audio statement, which was suppressed. (RR, SH 2 at 25). The audio recording was obtained in violation of Section 51.095 of the Texas Family Code. The written statement was the fruit of the tainted oral, audio confession and should be likewise inadmissible. *Wong Sun v. U. S.*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1962).

The impact of a warning, given after the first incriminating statement has been made is much weaker than it would have been absent a prior confession, for one cannot be reasonably expected to persist in the denial of that which he has already admitted. Although the legislature has determined that the solemnity of a warning given by a judicial officer is more efficacious, in the case of a child, than one given by a policeman, even a warning by a magistrate, and a determination by the magistrate that the confession is voluntary, is of questionable value when the magistrate's investigation is made in the absence of all knowledge of a prior illegal statement which places the child at a psychological disadvantage in the subsequent interrogation. Under such circumstances, the admonitions and counsel of the magistrate are unlikely to convert spiritless despair to alert diligence in a child whose secret is already 'out of the bag'. *R. C. S. v. State of Texas*, 546 S.W.2d 939 (Tex.Civ.App.1977, no writ); *In The Matter of L.R.S.*, 573 S.W.2d 888 (Tex.Civ.App-Houston [1 Dist] 1978).

27

In *Brown*, while under arrest, Brown made two in-custody inculpatory statements after having been given the Miranda warnings. These statements led to his indictment for murder and subsequent conviction. The Supreme Court of Illinois, recognizing that the accused's arrest was illegal, held that the statements were admissible on the ground that the giving of the Miranda warnings broke the causal connection between the illegal arrest and the statements. The United States Supreme Court reversed, stating:. . .Even if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. In order for the causal chain, between illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.' 371 U.S. at 486, 83 S.Ct. at 416. *Wong Sun* thus mandates consideration of a statement's admissibility in light of the distinct policies and interests of the Fourth Amendment. If Miranda warnings by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. *Brown v. Illinois*, 422 U.S. at 601, 95 S.Ct. at 2261; *L.R.S.* at 892.

The Court held that the question of whether a confession is the product of free will under *Wong Sun,* supra, must be decided on the facts of each case.

28

Factors to be considered when determining whether the confession was obtained by exploitation of an illegal arrest (or detention) include not only the Miranda warnings but also the time elapsed since the arrest or detention, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. Since Brown's statement was separated from his illegal arrest by less than two hours and there was no intervening event of significance, both statements were held inadmissible with the second statement being the fruit of the first. 422 U.S. at 604-605, 95 S.Ct. at 2262; *L.R.S.* at 892.

Just as in *L.R.S.*, here, there was a failure to comply with the requirements of Section 51.095(5) (a) of the Texas Family Code. Section 54.03(e), Title 3, of the Family Code states:

. . . An extrajudicial statement which was obtained without fulfilling the requirements of this title or of the constitution of this state or the United States, may not be used in an adjudication hearing . . .

Although the language of Section 54.03(e), indicates a statement may not be used in adjudication hearing, it is analogous to the case at bar.

In addition, in *L.R.S.*, the defendant did not have a sufficient cooling-off period after his illegal detention to reflect and then give an admissible statement.

29

See *United States v. Bayer*, supra; *Leyra v. Denno*, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 1079 (1954). Furthermore, the magistrate in making his decision as to whether the written confession had been given voluntarily, was unaware of what had occurred prior to the appellant's being brought to his office. The written statement was tainted by the prior inadmissible oral confession and was, therefore, also inadmissible.

Defendant's exhibit one, which is the audio statement, from the suppression hearing, that was suppressed, clearly reveals the dialogue between the Appellant and the police which led to Appellant's written statement. (RR, SH 2 at 28). The police are talking with the Appellant, on Defendant's exhibit one, for a lengthy period of time, discussing with Appellant what Appellant should include in his written statement. Appellant never had a period of time to reflect before providing his written statement. Furthermore, there is no testimony that indicates that Judge Ward was unaware of what had occurred prior to the Appellant's being brought to her office, to conclude his written statement. Here, as in *L.R.S.*, Appellant's written statement was tainted by the prior inadmissible oral confession and therefore should have been suppressed as fruits of the poison tree. It is undisputed that Appellant gave his audio, recorded oral confession prior to his written statement, which is on Defendant's exhibit one. (RR, SH 2 at 28). Although the

trial court did suppress Appellants audio, recorded oral confession, the trial court should have suppressed Appellants written statement as well.

## ARGUMENT

## POINT OF ERROR THREE

The evidence is insufficient to support Appellants conviction for aggravated robbery in cause number 12-DCR-61921.

In evaluating the legal sufficiency of the evidence, an appellate court will view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Laster v. State,* 275 S.W.3d 512, 517 (Tex.Crim.App.2009). This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. This court will not sit as a thirteenth juror and may not substitute its judgment for that of the fact finder by re-evaluating the weight and credibility of the evidence. *Brooks v. State*, 323 S.W.3d 893, 901-02 (Tex. Crim. App., 2010). However, a reviewing court's duty does require it to ensure that the evidence presented actually supports a conclusion that the defendant committed the

crime that was charged.  If the evidence establishes precisely what the State has alleged, but the acts that the State has alleged do not constitute a criminal offense under the totality of the circumstances, then that evidence, as a matter of law, cannot support a conviction.  *Williams v. State,* 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

Sec. 29.01  DEFINITIONS.  In this chapter:

1)  "In the course of committing theft" means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft…

Sec. 29.02 of the Texas Penal Code defines ROBBERY as:

(a) A person commits an offense if, in the course of committing theft as defined in Chapter 31 and with intent to obtain or maintain control of the property, he: (1) intentionally, knowingly, or recklessly causes bodily injury to another; or

(2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.

Section 29.03 of the Texas Penal Code defines AGGRAVATED ROBBERY as:

(a) A person commits an offense if he commits robbery as defined in Section 29.02, and he:

(1) causes serious bodily injury to another;

(2) uses or exhibits a deadly weapon; or

(3) causes bodily injury to another person or threatens or places another person in fear of imminent bodily injury or death, if the other person is:

(A) 65 years of age or older; or

(B) a disabled person.

Garza testified that the truck came to a stop and a young, light skinned, Spanish boy, maybe in his late teens, gets out of the passenger side of the truck with a gun in his right hand. Garza stepped on the gas and took off, thinking he was going to get robbed. The boy shot into Garza's driver window two times. Garza continued to travel on Highway 90 at a high rate of speed and called 911. The truck followed Garza at a high rate of speed also. Garza heard two more shots fired as the truck caught up with him and pass him. Eventually the truck turned back in the opposite direction and Garza heard two more shots fired as the truck traveled away at a high rate of speed. (RR at 6-34). However, on cross-examination, Garza testified that he never stopped his vehicle and that there was no

dialogue ever exchanged with the person who shot at him. Moreover, Garza assumed that this person was going to rob him. (RR 6 at 35-42).

The jury was put in a position to speculate and guess at what Appellant's conduct and intent was. Appellant could have intended to murder Garza or shoot at or near Garza. In addition, Appellant never had any dialogue with Garza to corroborate any intentions on Appellants part. Garza testified that he never stopped his vehicle and made an assumption that he was going to get robbed. (RR 6 at 35-42). This evidence does not support aggravated robbery or much less a conviction for aggravated robbery.

This evidence, when viewed in the light most favorable to the verdict, does not appear to support a finding that any rational trier of fact, could have found the Appellant guilty of aggravated robbery.

## CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Appellant, Damion Gentry, prays this court hold that the juvenile court's reasons for certifying Appellant were insufficient and abused its discretion; that the trial court committed reversible error and abused its discretion in denying appellants motion to suppress; and that the evidence is legally insufficient to support appellant's conviction for aggravated

robbery in cause number 12-DCR-61921; reverse the trial court's judgment and order an acquittal or order a new certification hearing that meets constitutional and statutory requirements as the law and justice demands.

.

Respectfully Submitted,

/s/ Michael C. Diaz
Michael C. Diaz
20228 Hwy. 6
Manvel, Texas 77578
Telephone: 281-489-2400
Facsimile: 281-489-2401
Texas Bar No. 00793616
E-mail: mjoeldiaz@sbcglobal.net
Attorney for Appellant

## CERTIFICATE OF COMPLIANCE

Pursuant to Tex. R. App. 9.4(i) 3, I hereby certify that the foregoing document, appellant's brief, filed on February 9, 2015, has 7033 words based upon the word count under Microsoft Word.

/s/ Michael C. Diaz
Michael C. Diaz
20228 Hwy. 6
Manvel, Texas 77578
Telephone: 281-489-2400
Facsimile: 281-489-2401
Texas Bar No. 00793616
E-mail: mjoeldiaz@sbcglobal.net
Attorney for Appellant

CERTIFICATE OF SERVICE

In accordance with TEX. R. APP. P. 9.5, I Michael C. Diaz, certify that a true and accurate copy of the foregoing brief for appellant has been served, by hand delivery on February 9, 2015, to John Harrity, Assistant District Attorney, Fort Bend County District Attorney's Office at 1422 Eugene Heimann Cir. Richmond, Texas.

/s/Michael C. Diaz
Michael C. Diaz

37